KEKAHA SUGAR CO., LTD., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 15435. Promulgated October 1, 1928.

W. W. *Spalding*, *Esq.*, for the petitioner.
M. N. *Fisher*, *Esq.*, and *L. C. Mitchell*, *Esq.*, for the respondent.

OPINION.

PHILLIPS: It is the primary contention of the petitioner that the determination of the tax liability for the year 1920 made by the Commissioner and evidenced by his letter of April 16, 1925, was a bar to the determination of any further tax liability for that year. It is first urged that section 274 of the Revenue Act of 1924 contemplates only one determination by the Commissioner. The Board has already determined this issue adversely to the claim of the petitioner in *J. W. Bowman*, 8 B. T. A. 526, where it was held that the mailing of one deficiency notice under the Revenue Act of 1924 did not bar the determination of a further deficiency and the mailing of notice thereof.

It is further urged that the petitioner accepted the determination evidenced by the letter of March 13, 1925, and that the result was a settlement which can only be set aside for fraud or mistake. Section 1006 of the Revenue Act of 1924, under which the determination of the deficiency was made, provides:

If after a determination and assessment in any case the taxpayer has paid in whole any tax or penalty, or accepted any abatement, credit, or refund based on such determination and assessment, and an agreement is made in writing between the taxpayer and the Commissioner, with the approval of the Secretary, that such determination and assessment shall be final and conclusive, then (except upon a showing of fraud or malfeasance or misrepresentation of fact materially affecting the determination or assessment thus made) (1) the case shall not be reopened or the determination and assessment modified by any officer, employee, or agent of the United States, and (2) no suit, action, or proceeding to annul, modify, or set aside such determination or assessment shall be entertained by any court of the United States.

It is not claimed that any agreement was made in writing between the taxpayer and the Commissioner, with the approval of the Secretary, the claim being in effect that a payment of the tax has the same effect as if the agreement provided for in the Act had been made. Congress has provided the method by which the determination and assessment may be made final and conclusive. To adopt the petitioner's theory would be to disregard the safeguard which the law has seen fit to throw about final and conclusive settlements. We are of the opinion that the Commissioner was authorized to make a second determination of deficiency and to notify petitioner thereof.

The decision of several of the errors alleged to have been made in computing income or invested capital involves the digesting and weighing of the testimony offered and the consideration of many primary facts in arriving at one or more ultimate facts, such as that of value. It seems unnecessary to set out or discuss such evidence in detail. We have confined our findings to those which seem necessary or appear essential to an understanding of the case, and we limit our discussion of the evidence as much as seems possible, consistent with our purpose to indicate the basis of our decision.

In computing the deficiency for 1920 the Commissioner refused to allow as a deduction the amount of certain payments or donations made by petitioner to churches which conducted services upon its plantation and certain charitable organizations which did welfare work among its employees. The principles which govern the deduction of contributions by corporations for such purposes have been discussed by us in *Poinsett Mills*, 1 B. T. A. 6; *Elm City Cotton Mills*, 5 B. T. A. 309; *Franklin Mills*, 7 B. T. A. 1290, and other cases. Without discussing the evidence in detail, we are satisfied that because of the extent of its plantation the petitioner was under the necessity of making some provision for a place of worship for its employees and that the small payments made to welfare organizations were made for the purpose of enabling those associations to continue necessary work among petitioner's employees. Donations were made to a few organizations from which the petitioner received no direct benefit, but these have been eliminated from the amounts set forth in our findings of fact. We are satisfied that as to the balance set out in our findings, the benefit to the petitioner was so direct as to constitute those payments ordinary and necessary expenses.

The question then arises as to whether such payments must be deducted in the year when paid or may be apportioned to the crops, as the petitioner has done upon its books. These payments were made for the benefit of employees who were working upon three crops, and in such circumstances we are of the opinion that the payments were sufficiently related to the crops so that we may not say that the system of accounting employed by the petitioner did not, in this respect, clearly reflect its income. The taxable income as determined by the Commissioner should be reduced by $1,632.78 and invested capital increased by $1,395.67.

The petitioner contends that upon organization it acquired, among other assets, a sublease which had a cash value of $1,300,000, which it is entitled to include in invested capital at that amount, less exhaustion thereof to the beginning of the taxable year. The evidence discloses that petitioner acquired three subleases. These were almost immediately replaced by a new sublease with different terms. Substantially all the evidence and argument are directed toward

showing the value of the corporation as an operating unit after it had obtained this new sublease. This has little, if any, bearing upon the value of the three subleases acquired at organization. It is this latter value, if any, which petitioner is entitled to include in its invested capital for it was these subleases which were obtained in exchange for stock. The evidence does not indicate that petitioner obtained the new sublease from the widow of Knudsen for its capital stock and no basis exists for computing invested capital on the basis of the value of this substituted asset.

We see nothing in the record which would indicate that the subleases assigned to the petitioner by its incorporators at the time of organization had any value. According to the oral testimony these leases provided for a rental of two-sixteenths of the crop. The new sublease which superseded them provided for a much smaller rental. Such a situation does not indicate that the subleases received from the incorporators had a substantial value. The picture which we visualize from the record is that of two plantations and a mill theretofore operated with indifferent success, reorganizing and combining their resources with the aid of their landlord in an attempt to arrive at a result which would permit of successful operation. It is our opinion that neither the three subleases originally acquired or the new sublease which replaced them, had any cash or market value at the time of acquisition. The Commissioner properly refused to allow any amount to be included in invested capital for such subleases.

At March 1, 1913, however, the situation was different. In 1907 extensive additions were made to the irrigating system which permitted not only of the cultivation of higher lands but produced a better and greater supply of water for the lower lands, which were the only lands under cultivation prior to 1907. By 1913 the operations of the company had been conducted profitably over a number of years. In *Oahu Sugar Company, Limited*, 13 B. T. A. 404, we have had occasion to discuss some of the factors to which consideration must be given in determining the March 1, 1913, value of leaseholds of sugar lands in the Hawaiian Islands. Much of what was said there is equally applicable here. The remaining life of the lease was short. This is particularly important when we consider that the sugar industry was considered as facing a period during which profits probably would decrease. On the other hand, the improvements placed upon the property were valued at a small fraction of their original cost. Considering the size of the plantation, the initial cost of the improvements at the depreciated values assigned to them by both parties would be comparatively small, but it would have to be recovered in a short period unless the lessee could secure a new lease. Here lies a factor deserving of much consideration.

The lessee in possession would be the logical person to secure a lease. Among other things, there would be no interruption of operation and no loss of income or rentals such as would result from a change of tenants where the crop takes two years to mature. The tenant in possession could afford to pay more than a new tenant, and the landlord could afford to take less because of this continuity of operations. Upon the basis on which the improvements were valued, the lease would have been attractive to one who believed he could secure a new lease at a reasonable rental. There was no reason to suppose this would not be done, at least as to a large part of the lands. We have no intention of intimating that the March 1, 1913, value should include any value for a new lease which would presumably be negotiated at current rentals or should include any part of the exhaustion deducted in arriving at the March 1, 1913, value of the improvements. There can be no question, however, that any purchaser would have seriously considered what advantage he would have as owner of the existing lease in obtaining a new lease, and that this is properly to be considered in arriving at the value. It is our opinion that on March 1, 1913, petitioner's leasehold interest had a fair market value of $300,000 in excess of the value of the improvements thereon, and that in computing taxable income it is entitled to deduct a reasonable allowance for the exhaustion thereof.

Although in the lease it was provided that the petitioner should pay its rental in sugar, it was customary for the petitioner to market such sugar and pay the lessor the market value. In 1918 it paid $114,159.58 as the rental for that year. One-third of this was charged on its books to the 1920 crop and deducted in computing 1920 income. Petitioner contends that, since the plantation was used during 1918 for the cultivation of three crops this represented a rental for all of the land and that on the crop system of accounting it may properly allocate one-third of this rental to each of the three crops. The respondent, on the other hand, contends that such a rental payment is unlike other expenses of producing the crop and may not be allocated over three crop years, that the lease provides for a payment in kind which must necessarily be taken from the crop harvested, and that the rental may only be deducted as a part of the cost of such crop. We are of the opinion that the respondent is correct in his contention. The proof of this may be seen if we look at the situation in which the petitioner would have found itself had it not been able to secure the renewal of its leases beyond 1920. In such a situation, following the basis on which the 1918 rental was apportioned, the rental paid in 1919 would have been apportioned one-half for the crop of that year and one-half for the crop of 1920, and the rental paid for 1920 would all have been apportioned to the 1920 crop, for the

petitioner would not have cultivated any 1921 or 1922 crops and could therefore not have charged any part of the rent for 1920 to such crops. The result would be that the 1920 crop would be charged·as rental with one-third of the rent paid in 1918, one-half of the rent paid in 1919 and all of the rent paid in 1920. Such a situation would obviously work a distortion of income. The reverse of this situation would occur in the case of a tenant first entering upon the cultivation of lands who, under petitioner's theory, would be entitled to deduct nothing for the first two years and only one-third of the rent paid in the third year. We are of the opinion that the rental is a direct charge against the crop from which it is paid and is deductible as a part of the cost of that crop. It follows that the Commissioner was correct in refusing to allow a deduction in 1920 of $38,053.22 of the amount paid in 1918, and in refusing to allow that amount to be included in earned surplus as a part of the cost of the 1920 crop.

In December, 1918, the petitioner paid $240,000 in order to secure the remainder interest held by the Knudsens under their lease from the Kingdom of Hawaii (the lease having been made before Hawaii became a territory of the United States) and in settlement of the rents which would become due during the remainder of the period for which it had a sublease. In computing its income it deducted as rental $130,000 of this amount. The Commissioner disallowed $34,000. It is contended by the petitioner that $30,000 of this amount was paid specifically for the month of May, 1920, being the unexpired portion of the lease held by the Knudsens. The only evidence of this is that the directors at a meeting authorized the payment of $30,000 to secure these rights. There is nothing to indicate that when the agreement was reached between petitioner and the Knudsens any specific amount was paid for this month. The agreement appears to have been reached on the basis of a lump-sum payment of $240,000 for the balance of the term and it is our opinion that the payment must be treated on this basis. Aside from their difference with respect to this item of $30,000, counsel for the parties are now agreed that the payment should be distributed over 29 months and that twelve-twenty-ninths is the proper deduction for 1920. The income and invested capital should be adjusted accordingly.

The Commissioner reduced the amount of depreciation claimed by the petitioner from $112,554.38 to $40,000. This is now conceded by his counsel to have been in error and the income should be adjusted accordingly.

Over a period of several years the petitioner had reclaimed swamp lands near the shore by diverting the water which ran down from the hills in the rear of its plantations into such swamps, causing the silt to be deposited there and gradually raising the elevation until in 1920 it had reclaimed some 300 or more acres, all of which it had

under cultivation and which had proved to be very productive. In so doing it was necessary to construct ditches from time to time. In his determination of invested capital the Commissioner treated these payments as annual expenses to be charged off each year and refused to permit any part of the amount so expended to be included in computing the earned surplus of the petitioner. At the hearing the Commissioner sought to show that these ditches were used for the purpose of protecting the lands of the petitioner against inundation by heavy rainfalls in the hills, but was not successful in that effort. The primary purpose of the ditches and drains constructed by the petitioner appears to have been to permit the reclamation of these low lands and there seems to be no doubt on the record before us that petitioner is entitled to include the unamortized cost in computing its earned surplus. See *J. H. Sanford*, 2 B. T. A. 181.

The petitioner claims to be entitled to assessment under section 328 of the Revenue Act of 1918. It urges that no salaries were paid to its officers, thereby creating an abnormal condition. There is nothing to indicate that any of the officers devoted a substantial portion of their time to the affairs of the petitioner and it appears that it was not customary on the Islands for sugar companies to pay salaries to their officers. These officers apparently functioned much as do directors of a corporation, dealing with the general interests of the corporation but leaving the details to others who were paid. We see nothing abnormal in this situation.

The petitioner further urges as a ground for special assessment under section 328 of the Act that an abnormality exists because the business of the petitioner was conducted so largely upon leased lands, whereby the necessity for a capital investment in real estate was unnecessary. We believe that this claim for special assessment disappears when it is considered that the petitioner was entitled to a deduction of the amount of the rental paid and also a deduction for the amortization of the March 1, 1913, value of the leaseholds, neither of which deductions would be granted in the case of a corporation owning its lands in fee. Moreover, it appears that each of the corporations submitted by the petitioner as comparatives is in much the same situation as the petitioner, operating their plantations largely under leases.

It is urged by the petitioner that an abnormality exists because of the small amount of working capital which it was necessary for the petitioner to provide. This was due to the fact that American Factors, Ltd., who were the agents of the petitioner for the purpose of selling its sugar, were under an agreement to finance the operations of the petitioner pending the sale of its crop. We see nothing abnormal in this situation, for presumably the agents were compen-

sated by the commission which they received for acting as such, which in turn served to reduce the taxable income of the petitioner.

The claim of abnormality most seriously urged by the petitioner is that while its physical assets were acquired at a cost in excess of $1,500,000, these assets were reflected in its invested capital for 1920 at $210,000. This was due to the fact that at January 1, 1920, the petitioner's lease had only a short period to run and that the cost of the assets had been amortized over the period of the lease. It is claimed by the petitioner that this created an abnormality in its invested capital as compared with other corporations in the same business. The primary purpose of the invested capital provisions of the excess-profits-tax laws has been to provide for a certain return upon capital invested in the business before taxes were assessed upon the balance of the earnings. When the amount is invested in assets having a fixed or determinable life, provision is made in the act for allowing a return of the capital invested by way of a deduction for the exhaustion thereof. In this way the capital invested is returned free of any tax over the useful life of the assets. It is for this reason that the $1,500,000 originally invested in assets has been reduced to $210,000. This latter figure represents the amount which the petitioner had originally invested in tangible assets and which it had not recovered free of tax by way of a deduction in computing income. Although the amount originally invested in these assets was substantially larger, all that was at risk in the business in 1920 was the unexhausted or undepreciated cost. It is on this amount that the taxpayer is entitled to earn the credit provided by the law before the profits tax is computed upon the balance of its income. It must also be understood that by reason of the shorter life of the petitioner's lease, its annual deduction for depreciation and exhaustion of its assets is greater, thus serving to reduce its annual taxable income. We are of the opinion that the taxpayer has not established any abnormal condition affecting either its income or its capital which entitled it to a computation of its tax under section 328 of the 1918 Act.

*Decision will be entered under Rule 50.*