GULF, MOBILE & NORTHERN RAILROAD COMPANY, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JACKSON & EASTERN RAILWAY COMPANY, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MERIDIAN & MEMPHIS RAILWAY COMPANY, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 24887, 35898, 38295, 42149, 42150.   Promulgated February 20, 1931.

*George E. H. Goodner, Esq.,* and *Walter K. Smith, Esq.,* for the petitioners.
*E. C. Algire, Esq.,* for the respondent.

236

240

OPINION.

TRAMMELL: Several assignments of error have been admitted by the respondent, necessitating adjustments in the net incomes determined in the deficiency notices, as follows:

*Docket No. 24887.*

Net income for 1920 should be reduced (1) by $7,918.02 on account of " so-called ' donations ' "; (2) by $150,196.34, on account of " depreciation on equipment sustained during the Federal control period and charged to the Director General of Railroads, but which was not allowed by him in the final settlement in 1920; (3) by $82,187.99, on account of " overmaintenance charged to petitioner in the final settlement of 1920 "; (4) by $162.06, on account of amortization of bond discount; and net income should be increased by $2,226.49, on account of " miscellaneous items of income received by petitioner in the final settlement in 1920." Also, the respondent admits error in having computed the tax for 1920 at the rate of 10 per cent upon the entire net income, conceding that the tax upon the net income earned during the two months of Federal control, January and February, should be computed at the rate of 8 per cent. The tax will be computed accordingly in the final order of redetermination.

*Docket No. 42150.*

Net incomes for 1925 and 1926 should be reduced by the amounts of $4,280.29 and $10,200.58, respectively, on account of additional mail pay received in those years for 1916 and 1917.

*Docket No. 42149.*

Net income for the period January 1 to August 15, 1926, should be reduced by $750.95, on account of additional mail pay received in that period for 1916 and 1917.

*Docket No. 35898.*

Net income for 1922 should be reduced (1) by $11,327.55 on account of " property received by petitioner as a gift "; and (2) by $648.22, on account of amortization of bond discount. The consolidated net loss for 1921, which respondent has deducted from consolidated net income for 1922, should be increased (1) by $14,-936.56, on account of " property received by petitioner as a gift "; (2) by $648.22, on account of amortization of bond discount; (3) by $51,559.52, " on account of Federal control lump sum settlement "; and decreased by $150,196.34, on account of " overmaintenance of petitioner's. property while under Federal control."

TRANSPORTATION FOR INVESTMENT—CR.

*Issue (b), Dockets Nos. 24887, 42150, 35898; and (d), Docket No. 35898.*

Petitioners, Gulf, Mobile & Northern and Meridian & Memphis, complain of respondent's action in reducing the deductions claimed for operating expenses, for 1920, 1921, 1922, and 1924 by the amounts credited in those years, under regulations of the Interstate Commerce Commission, to accounts designated on their books " Transportation for Investment—Cr."

The evidence shows that during the years in controversy, the petitioners transported men and materials over their own lines for construction purposes; that such transportation was accomplished, as a rule, by regularly scheduled freight and passenger trains and did not involve additional equipment and service expense; that the expenses of operating such train facilities are more or less constant and are not appreciably affected by transporting such workmen and materials; and that the amounts credited, in the years in question, to " Transportation for Investment—Cr." accounts are arbitrary, represent the maximum amounts which could be credited to such accounts under regulations of the Interstate Commerce Commission, and, consequently, may or may not bear a true relation to the cost of such transportation. On these facts, we are asked to set aside the respondent's determination and permit the deduction of the amounts in question, in computing consolidated net income for 1920, 1922, and 1924, and the consolidated net loss for 1921.

The precise question raised here was considered by the Board in *Great Northern Railway Co.*, 8 B. T. A. 225. There we held that the cost of transporting men engaged in and materials to be used for new construction constituted a capital expenditure and not a proper

deduction in computing taxable net income. In this the Board was affirmed by the Circuit Court of Appeals, Eighth Circuit. *Great Northern Railway Co.* v. *Commissioner of Internal Revenue*, 40 Fed. (2d) 372. Confessedly, some expense was incurred in transporting workmen and materials for construction purposes, and it is admitted by both parties that the amounts credited to "Transporation for Investment—Cr." accounts and charged to capital on account of such transportation are arbitrary and represent the maximum amounts which could be so treated under the regulations of the Interstate Commerce Commission. In this situation, the burden rested upon the petitioners to show that the costs of such transportation are less than the amounts shown on the books of account, but the evidence falls far short of establishing the fact. The evidence does not do more than show that the cost of such transportation, in any particular instance, may be but a negligible factor, in the sense that the more or less constant expenses of operating the facilities by means of which such transportation is usually accomplished are not appreciably affected. A somewhat similar situation was encountered in *Great Northern Railway Co.*, *supra*, and the Circuit Court, in commenting thereon, spoke as follows:

The appellant contends that it was put to no additional expense in transporting the few men at a time on a regular passenger train as this involved no additional equipment or service expense because the trains upon which the transportation occurred would have been run in the same way whether these workmen were carried or not. A similar contention is made concerning the carriage of material except that appellant makes a rather grudging concession that the sum of $41,799.45 might be apportioned to this because of the cost of repairs to freight cars, fuel and water for steam locomotives and electric power for electric locomotives. * * * The entire evidence and argument seem merely to show that there is an actual expense for transporting the men and material but that the amount of such expense cannot possibly be ascertained with anything like approximation, but must be estimated rather vaguely. This difficulty is evidently what led the Commission to fix a definite maximum which it would allow, without examination, for such purposes. Unquestionably, that maximum was the result of investigation and intended to represent an estimate of the average for such costs. This appellant adopted that maximum. According to its own evidence, it did so "as representing reasonable allowances for the value of these services." If there was an advantage in its selection of that basis it got the advantage thereof in its capital account upon which its rates would be based. It cannot now say that such entry in its own books for that purpose is not competent evidence of the facts supposed to be represented thereby. The burden is upon it to show that such were less.

Here the petitioners adopted the maximum amounts which, under the regulations of the Interstate Commerce Commission, could be treated as capital investment, and such amounts must be permitted to stand until it is shown by clear and convincing evidence that the actual costs of transportation incurred are less than the amounts

reflected by the books. On this issue, we find no proper grounds for disturbing the respondent's action.

PAYMENT UNDER SECTION 209, TRANSPORTATION ACT OF 1920.

*Issue (c), Docket No. 24887.*

The petitioner contends that the amount which it received from the United States Government pursuant to section 209 of the Transportation Act of 1920 does not constitute taxable income. It argues that the amount received does not come within the definition of gross income set out in the statute nor within the scope of the definition of income in the Sixteenth Amendment as laid down by the Supreme Court. The pertinent provisions of section 209 of the Transportation Act are as follows:

The term " guaranty period " means the six months beginning March 1, 1920. The term " test period " means the three years ending June 30, 1917; and

The term " railway operating income " and other references to accounts of carriers by railroad shall, in the case of a sleeping car company, be construed as indicating the appropriate corresponding accounts in the accounting system prescribed by the Commission.

(b) This section shall not be applicable to any carrier which does not on ⁺or before March 15, 1920, file with the Commission a written statement that it accepts all the provisions of this section.

(c) The United States hereby guarantees—

(1) With respect to any carrier with which a contract (exclusive of so-called cooperative contracts or waivers) has been made fixing the amount of just compensation under the Federal Control Act, that the railway operating income of such carrier for the guaranty period as a whole shall not be less than one-half the amount named in such contract as annual compensation, or, where the contract fixed a lump sum as compensation for the whole period of Federal operation, that the railway operating income of such carrier for the guaranty period as a whole shall not be less than an amount which shall bear the same proportion to the lump sum so fixed as six months bears to the number of months during which such carrier was under Federal operation, including in both cases the increases in such compensation provided for in section 4 of the Federal Control Act;

(2) With respect to any carrier entitled to just compensation under the Federal Control Act, with which such a contract has not been made, that the railway operating income of such carrier for the guaranty period as a whole shall not be less than one-half of the annual amount estimated by the President as just compensation for such carrier under the Federal Control Act, including the increases in such compensation, provided for in section 4 of the Federal Control Act. If any such carrier does not accept the President's estimate respecting its just compensation, and if in proceedings under section 3 of the Federal Control Act it is determined that a larger or smaller annual amount is due as just compensation, the guaranty under this paragraph shall be increased or decreased accordingly;

(3) With respect to any carrier, whether or not entitled to just compensation under the Federal Control Act, with which such a contract has not been made, and for which no estimate of just compensation is made by the Presi-

dent, and which for the test period as a whole sustained a deficit in railway operating income, the guaranty shall be a sum equal to (a) the amount by which any deficit in its railway operating income for the guaranty period as a whole exceeds one-half of its average annual deficit in railway operating income for the test period, plus (b) an amount equal to one-half the annual sum fixed by the President under section 4 of the Federal Control Act;

(4) With respect to any carrier not entitled to just compensation under the Federal Control Act, which for the test period as a whole had an average annual railway operating income, that the railway operating income of such carrier for the guaranty period as a whole shall not be less than one-half the average annual railway operating income of such carrier during the test period.

(d) If for the guaranty period as a whole the railway operating income of any carrier entitled to a guaranty under paragraph (1), (2) or (4) of subdivision (c) is in excess of the minimum railway operating income guaranteed. in such paragraph, such carrier shall forthwith pay the amount of such excess into the Treasury of the United States. If for the guaranty period as a whole the railway operating income of any carrier entitled to a guaranty under paragraph (3) of subdivision (c) is in excess of one-half of the annual sum fixed by the President with respect to such carrier under section 4 of the Federal Control Act, such carrier shall forthwith pay the amount of such excess into the Treasury of the United States. The amounts so paid into the Treasury of the United States shall be added to the funds made available under section 202 for the purposes indicated in such section. Notwithstanding the provisions of this subdivision, any carrier may retain out of any such excess any amount necessary to enable it to pay its fixed charges accruing during the guaranty＊ period.

(e) For the purposes of this section railway operating income, or any deficit therein, for the test period shall be computed in the manner provided for in section 1 of the Federal Control Act.

(f) In computing railway operating income, or any deficit therein, for the guaranty period for the purposes of this section—

*     *     *     *     *     *     *

(4) There shall not be included any taxes paid under Title I or II of the Revenue Act of 1917, or such portion of the taxes paid under Title II or III of the Revenue Act of 1918 as by the terms of such Act are to be treated as levied by an Act in amendment of Title I or II of the Revenue Act of 1917;  *  *  *

Pursuant to the proclamation of the President issued December 24, 1919, all railroads and systems of transportation were released from Federal control on the first of March, 1920, and turned back to their respective owners. The guaranty payments under section 209 were no part of the payments made by the Government to the railroads on account of the operation under the Federal Control Act of 1918 as just compensation for the taking of property for public use. Any and all such liability which the Government incurred or was under to the railroads as the result of Federal control was either adjusted or was subject to adjustment independent of section 209 of the Transportation Act.

Perhaps the best statement of the purpose of the payments contemplated under section 209 of the Transportation Act is found in

the words of Mr. Justice Brandeis in the case of *United States* v. *Guaranty Trust Co.*, 280 U. S. 478, where he said:

These appropriations were made in order to meet a present need. At the time of the passage of Transportation Act 1920, most of the railroads of the United States lacked funds for necessary improvements, equipment, and expense of facilities. Some of the carriers needed funds, also, to meet maturing obligations. The credit of many carriers was seriously impaired. There was a general reluctance among investors to purchase new railroad securities even on the strongest railroads. Congress deemed it important to preserve for the nation substantially the whole existing transportation system. * * * In order to accomplish this, it was thought necessary that the United States should, to a certain extent, finance the carriers until it would become possible to restore their credits, by increase of rates or otherwise. The provisions of Title II of Transportation Act 1920 were framed to that end.

The United States Supreme Court in the case of *Akron C. & Y. Co.* v. *United States*, 261 U. S. 184, with reference to the payments by the Government to the railroad under section 209, stated as follows:

The credit of the carriers, as a whole, had been seriously impaired. To preserve for the nation substantially the whole transportation system was deemed important. By many railroads funds were needed, not only for improvement and expansion of facilities, but for adequate maintenance. On some, continued operation would be impossible unless additional revenues were procured.

The Interstate Commerce Commission, in Finance Docket No. 1176, 70 I. C. C. 115, in a decision rendered July 12, 1921, with respect to the nature of the guaranty payments under section 209 said:

The guaranty under Section 209 is wholly independent of any damages which the carriers may have suffered by reason of the temporary taking of their property during the period of Federal control. For all such damages the Government must render just compensation; and by their acceptance of the provisions of Section 209 the carriers have in no way surrendered or abated any claims arising out of Federal operation. The guaranty, therefore, was not founded upon a legal obligation, * * *

The purpose of the payments to the railroads under the above act is also shown by statements of the members of the Committees in Congress in charge of the bill in the course of its passage, and resort may be had to these statements as indicating the purpose of this legislation. *Wisconsin Railroad Commission* v. *C. B. & Q. R. R. Co.*, 257 U. S. 562; *Duplex* v. *Deering*, 254 U. S. 443; *United States* v. *St. Paul M. & N. R. Co.*, 247 U. S. 310.

Representative Denison, a member of the Committee in charge of the bill, stated as follows (Congressional Record, vol. 58, pt. 8, p. 8458): "The great thing that the railroads will need in the immediate future is credit and this guaranty provision in the bill is intended largely to reestablish their credit in the markets of the world."

It appears from the history of the legislation, the statements of the United States Supreme Court and the discussions by members of the Committees in charge of the passage of the bill in Congress, that the primary purpose of the guaranty payments was to reestablish the credit of the railroads. The reestablishment of their credit would enable them to sell securities to obtain funds necessary to their operations, as well as for securing improvements and equipment. As a means of establishing this credit to the railroads their railway operating income was guaranteed to be a certain amount. It is a matter of public knowledge that the expenses of operation of the railroads had been materially increased during the Federal control period on account of the increased compensation of employees and higher costs of supplies; that freight and passenger rates had not been adjusted to meet this additional expense; that under Federal control the routes of carriers had been changed in order to permit the most direct route of transportation; that the cars and other facilities had become scattered; and that other factors existed at the time of the turning the operation of the railroads back to their owners which would materially affect their income-producing power. Congress took into consideration the condition of the roads caused largely by the Federal control. Under section 209 of the Transportation Act the Government guaranteed a stabilized and certain income to the carriers during the guaranty period, which was the six months beginning March 1, 1920. This was a period of readjustment. It was necessary that something be done by Congress in order to assure the efficient operation of the railway systems. In order to accomplish this purpose their credit had to be reestablished by some means. If, instead of guaranteeing the railway operating income, Congress had increased rates to accomplish the same result, of course no question of taxability of the increased revenue could have arisen.

The establishment of the credit of the railroads through the guaranty payments enabled the railroads to make a certain definite amount of railway operating income. This was for the purpose of establishing credit through the means of enabling the owners of railroad securities to secure a definite return upon their securities. The guaranteed earning power was a stabilizing factor. If the railway operating income was less than a certain amount the Government would make up the difference, so that in any event the railroad's operating income, of which its owners and securityholders would receive the benefit, would have been not less than its average railway operating income for the test period, that is, for the three years ended June 30, 1917.

The deficiency in railway operating income was made up by the guaranty instead of by the shippers and traveling public. It does

not seem to be material from what source the deficiency was made up, if it was in fact the railway operating income which was made up. If the payments by the Government did not form a part of the railway operating income, then the provisions of the statute still have not been met, because the Government guaranteed that that income would be a certain amount. The income received in due course from freight and passenger traffic and the amounts received from the Government together made up the operating income, so that in the end the railroads had their railway operating income in the guaranteed amount.

We do not think that it can be successfully contended that the Government voluntarily made the payments as gifts without any consideration. If they were mere gratuities or bounties there would be serious question as to their constitutionality. See *United States* v. *Realty Co.*, 163 U. S. 247; *United States ex rel Miles Planting & Mfg. Co.* v. *Carlisle*, 5 D. C. App. 138; *Field* v. *Clark*, 143 U. S. 649. The benefits flowing to the country as a whole, the recognition of the condition of the railroads brought about largely through Federal control, the equitable and honorary obligation on the part of the Government, the mutuality of the arrangement between the Government and the railroads are factors which can not be ignored. If one person, for considerations deemed by him to be sufficient, agrees with another that such person's income would not be less than a certain amount and makes payments to such person to make good any deficiency, it is difficult to see under what theory such amounts would not be income to the person receiving the payments. If one person's profits are guaranteed by another if not received by a certain source, they are still profits if received from the guarantor.

It is to be observed that section 209 makes no provision that such payments by the Government shall be exempt from income tax. Congress undoubtedly had the option to pay the full amount of the deficit in railway operating income or any part thereof, considering in this connection such amount of income below the guaranteed amount as being a deficit, and subject said payments to tax the same as any other income, or to pay the railroads a smaller sum less what the tax would have been on a larger sum paid.

It seems clear that Congress chose the former method instead of the latter. The provision in subsection (f) (4) of section 209 that in computing railway operating income or any deficit therein for the guaranty period certain taxes could not be included, is an indication that Congress did not leave out of consideration the question of taxes in determining the railway operating income and apparently intended that any payments by the Government should be governed by whatever statutory provisions might be applicable. While making provision with respect to taxes, if Congress had intended

that any payments by the Government were to be exempt it could have made specific provision therefor in unmistakable language. Clearly the language used is not an express exemption, nor can we construe the provision as indicating an intention to exempt the Government payments from the tax; yet, if there is doubt or ambiguity on the question, statutory exemption from tax should be construed strictly in favor of the Government and against the exemption, see *Lewellyn* v. *Harbison* (C. C. A., 3d Cir.), 31 Fed. (2d) 740; *Bank of Commerce* v. *Tennessee*, 161 U. S. 134, an entirely different rule from that with respect to the imposition of taxes. The method of taxation of railroads and the fact that they were given some concession with respect to taxes imposed by section 230 of the Revenue Act of 1918 in our opinion throws no light on the question. See *New York, Ontario & Western Ry. Co.*, 1 B. T. A. 1172. If it be contended that it was *net railway operating* income which was guaranteed, that Federal taxes must be deducted before that net income can be determined; and, consequently, that unless the Government in effect bore the tax, the net income had not been made up by the Government, we think that this contention is answered by the provision of the statute that the Federal taxes paid should not be included in determining the income during the guaranty period.

The same argument might be made as to the just compensation during the Federal control period. It might be contended that the carrier had not received the amount of the just compensation represented by guaranteed or agreed payments unless Federal taxes had been deducted in determining railway operating income. But we think that section 1 of the Federal Control Act, providing that "Every such agreement [between the Government and carrier] shall provide that any Federal taxes under the Act of October third, nineteen hundred and seventeen, or Acts in addition thereto or in amendment thereof, commonly called war taxes, assessed for the period of Federal control beginning January first, nineteen hundred and eighteen, or any part of such period, shall be paid by the carrier out of its own funds, or shall be charged against or deducted from the just compensation * * *," makes it clear that the taxes imposed by section 230 of the Revenue Act of 1918 as it referred to carriers were intended to be paid by them, and section 209 (f) (4) of the Transportation Act was apparently put in that act to make it plain that Congress did not intend indirectly to relieve the carriers of that tax by making greater payments under the guaranty provisions for the six-month period following Federal control, and indicates that it was *railway operating income* in a specifically restricted sense which was guaranteed. If taxes are to be deducted in computing *railway operating income* under regulations of the Interstate Commerce Com-

mission as a general rule (see *New York, Ontario & Western Ry. Co.*, *supra*), in so far as the Government payments to carriers are concerned, Congress saw fit in section 209 to provide otherwise and to make it clear that it was railway operating income less Federal taxes before the guaranty payments were made which the Government was to guarantee. It was a method of determining how much the Government would pay the carriers. We can find no support for the proposition that any language in section 209 intended to exempt any income of carriers from taxes and we think that the Government payments constituted income.

If the railroad had earned during the guaranty period through its railways operations the amount guaranteed by the Government, there could be no question but that it would be subject to tax as the just compensation was; yet the payments made under section 209 by the Government to make up the railway operating income to a certain point seem to us to be equally taxable income. The payments were in fact and substance as much railway operating income as any other income. They were in fact income received on account of the operation of the railroads. It is merely received from the United States, that is, all of the people of the United States instead of specifically from the shippers or passengers. It seems that no distinction should be made between those railroads whose actual railway operating income without Government payments equaled the amount guaranteed by the Government and those in which the Government made up the difference. The difference made up was railway operating income. We can find no justification in the legislation or any rule of statutory construction which would warrant one railroad in being relieved from tax liability where its actual income or receipts were the same as another railroad which is required to pay the tax. We do not think that Congress intended payments to the railroads in order to bring their railway operating income up to a certain amount and at the same time to exempt the railroads from tax on the payments. This would amount in effect to the Government paying to the railroads not only the amount of guaranty payments, but the amount of tax thereon.

On the other hand, if the payments by the Government to the railroads constituted gifts or subsidies free from tax, the question is what would be the nature of the payments made by the railroads to the Government where the railroads had excess income. It would be a strained construction to say that the amounts paid by the railroads to the Government where their income exceeded a certain amount were gifts by the railroads to the Government. Clearly, the railroads did not consider that they were making voluntary contributions to the Federal Government in making such payments, nor do

we consider that the Government was making gifts or mere volun-
tary contributions to the railroads where the railway operating income
did not come up to the guaranteed amount.

It is contended that the payments by the Government did not
meet the test laid down by the Supreme Court as to the meaning of
income. The United States Supreme Court, in the case of *Eisner* v.
*Macomber*, 252 U. S. 189, said, "income may be defined as the gain
derived from capital, from labor, or from both combined, provided it
be understood to include profit gained through a sale or conversion
of capital assets."

It is contended by the petitioner that the payments did not come
within the scope of this definition. The payments by the Govern-
ment, however, were dependent upon the operation of the railroad,
that is, the use of both capital and labor. The payments were not
received for the guaranty period unless the railroads were in opera-
tion during that period, and then only in the event that their operat-
ing income was less than the guaranteed amount, and we can not
overlook the fact that it was railway operating income which was
guaranteed and made up. The Government derived a substantial
benefit from the payments. It received consideration from the sub-
stantial good obtained for or expected to be obtained for the people
as a whole on account of the more efficient operation of the railroads
and the further establishment of their credit.

It may be perfectly true that Congress was impelled by no legal
obligation in enacting this legislation requiring the Government to
make these payments, but it seems to be clear that the Government
took into consideration the benefits to be derived by the people of
the United States, and that there were obligations of " an equitable,
moral and honorary nature " on the part of the Government existing
on account of the condition of the railway systems immediately after
Federal control and largely as a result thereof. The Supreme
Court, in the case of *United States* v. *Realty Co.*, 163 U. S. 427,
said that such considerations were sufficient to authorize Congress
" to recognize the equities of the situation and to pay the claims,
which while they were not of a legal character, were nevertheless
of so meritorious and equitable nature as to authorize the nation
through its Congress to appropriate money to pay." Such an obli-
gation on the part of the Government may well be said to take the
place of a legal obligation to such an extent that payments thereof
were not mere gratuities or subsidies, as the Supreme Court held
in the above cited case. That case involved the question of the
constitutionality of payments made by the Government to certain
sugar manufacturers after repeal of the sugar bounty statute. It
was contended that Congress was without power to pay bounties,

but the Court held that while there was no legal obligation to make the payments after the repeal of the law, yet since certain manufacturers had relied on the repealed statute, to their disadvantage, Congress had the right to recognize the equitable and moral and honorary obligation and that the payments based on this condition were not bounties or subsidies, but based on valid consideration. Under the reasoning of that case, the payments here involved were not subsidies or bounties. But in any event, regardless of the obligations of the Government before section 209 became law, after the railroads had accepted its terms the Government was bound by legal obligation to make the necessary payments and the railroads were equally bound to pay certain excess earnings over the specified amounts to the Government. There can be no question of the mutuality of the arrangement. There was a mutuality of benefit as well as a mutuality of obligation.

The railroads, in order to receive the guaranty payments under section 209, had to file a written acceptance of all provisions of that section within a certain time. One of the conditions of section 209 was that, if the railway operating income exceeded a certain amount, the excess would be paid to the Government. This in fact constituted a contractual agreement between the carrier and the Government and it could not be ascertained until an accounting had been had whether the Government would pay the railroad or whether the railroad would pay to the Government. We think that this feature of the case takes away any basis for holding that the payments by the Government were pure gifts or subsidies to the railroads.

The petitioner relies upon the case of *Edwards* v. *Cuba Railroad Co.*, 268 U. S. 628. In that case the United States Supreme Court said:

The subsidy payments were proportionate to mileage completed; and this indicates a purpose to reimburse plaintiff for capital expenditures. All—the physical properties and the money subsidies—were given for the same purposes. It can not reasonably be held that one was contribution to capital assets and that the other was profit, gain, or income. Neither the laws nor the contracts indicate that the money subsidies were to be used for the payments of dividends, interest, or anything else properly chargeable to or payable out of earnings or income. The subsidy payments taxed were not made for services rendered or to be rendered. They were not profits or gains from the use or operation of the railroad, and do not constitute income within the meaning of the sixteenth amendment. See *Stratton's Independence* v. *Howbert* (231 U. S. 399, 415) ; *Eisner* v. *Macomber* (252 U. S. 189, 207) ; *Merchants' Loan & Trust Co.* v. *Smietanka* (255 U. S. 509).

In the *Cuba Railroad* case it is to be observed that the payments to the railroad were not for the payment of dividends, interest or

anything else properly chargeable to or payable out of earnings or income, but were capital contributions. They were made in proportion to mileage completed. In this case, however, the payments were made primarily for the purpose of establishing credit of the railroads to enable the owners and securityholders to derive income in the way of dividends or interest or otherwise. It was railway operating income which the Government added to and increased and made up to a certain amount. It was railway operating income which was guaranteed. The payments were not capital contributions as was the case in the *Cuba Railroad* case, *supra*, and the cases decided by the Board. *Liberty Light & Power Co.*, 4 B. T. A. 155; *Arkansas Compress Co.*, 8 B. T. A. 155; *Great Northern Railway Co.*, 8 B. T. A. 225; *Texas & Pacific Railway Co.*, 9 B. T. A. 365; *Atlantic Coast Line Railroad Co.*, 9 B. T. A. 1193; *Wisconsin Hydro-Electric Co.*, 10 B. T. A. 933, and others.

We think that the entire amount received under section 209 became a part of the railway operating income in every substantial sense of the word. This is a substantially different state of facts from those in the *Cuba Railroad* case, *supra*. We think that it is not important that under the Act the carriers were free to use the money received from the Government for any purpose they saw fit. Taxpayers are always free to use their income for capital improvements if they desire, but this does not change its character when received, but the fact that it was not restricted to capital additions or improvements or was on account thereof is important. We therefore think that the amounts received by the railroad in this case from the Government under section 209 constituted taxable income.

### Inventory Adjustment—Final Settlement With Director General.

### *Issue (f), Docket No. 24887.*

At the beginning of Federal control, the petitioner turned over to the Director General of Railroads an inventory of materials and supplies which it had acquired at a cost of $286,664.26. At the end of the Federal control period, February 29, 1920, the petitioner received back from that official an inventory of materials and supplies of the market value of $275,912.03. Later in 1920, in its final settlement with the Director General, the petitioner was allowed the sum of $61,314.18 for shortages in, and differences in grade and quality of, materials and supplies turned back by that official, in comparison with the materials and supplies turned over to him by petitioner at the beginning of Federal control. The aggregate value of the cash and materials and supplies received from the Director General in 1920 exceeded the cost of the inventory turned over to that

official, at the beginning of Federal control, by $50,561.95, and the respondent has held such excess is income to the petitioner for 1920. The petitioners contend that such a transaction does not give rise to taxable income, because there was no sale or other disposition of property to the United States and that which was received was not more than sufficient to make it whole against the deficiencies resulting from Government control and operation of its properties.

The question raised here was considered by the Board in *Lehigh & Hudson River Railway Co.*, 13 B. T. A. 1154, in which the facts were identical with those of this case, and was decided adversely to the petitioner. There we held that:

> The acts relating to Federal control should be read with the revenue acts in order to determine the intent of Congress, but we do not believe that Congress ever indicated in any act relating to Federal control of railroads that circumstances such as are present in this case could not give rise to income. Particularly is this true when we consider the Commissioner's regulations and certain provisions of the Revenue Act of 1921. Under the revenue acts, if a person parts with his property and, as a result, receives cash or its equivalent in excess of the cost or, in a proper case, the March 1, 1913, value of the property, he has received income. This is so whether he parted with the property voluntarily or involuntarily.

The order of the Board in the cited case was reviewed by the Circuit Court Appeals, Second Circuit (36 Fed. (2d) 719), and, in affirming the decision of the Board on this question, the Court spoke as follows:

> Such a transaction is equivalent for tax purposes to a sale of the supplies at the agreed price. The Act of 1918 did not indeed expressly provide for gains arising from the requisition of property, but Article 49 of the Regulations did: " When the owner of property has lost or transferred title by reason of acquisition or eminent domain * * * if the taxpayer does not elect to replace or restore the property, the transaction will then be deemed to be completed and the income shall be measured by the excess of the amount of the compensation over the cost of the property." This Article and Article 50 prescribed the formalities by which the election should be manifested, with none of which the railway conformed. Section 234 (a) (14) of the Act of 1921 treats such a gain as income and in our judgment it is no more than declaratory of what was implicit before. It can scarcely be necessary to labor the argument that a man may make the same profit out of property which has been requisitioned, as he would out of its sale at the same price. *Edwards* v. *Cuba R. R.* 268 U. S. 628, touched subsidies which were not given altogether for a consideration moving from the grantor; they were not therefore to be regarded as income paid in advance. Moreover, they were not payments from property taken.

There is no evidence that the petitioner elected to replace or restore the requisitioned property, or that it made application to establish a replacement fund as provided by article 50 of Regulations 45. Under the circumstances, the transaction must be regarded as having been completed in 1920, the year in which compensation

was received, and the income arising therefrom measured by the excess of the compensation over the cost of the property. This leaves for decision the question of fact as to the gain derived from the sale or conversion of the requisitioned property, and as to that it is sufficient to say that there is no evidence upon which we can base a conclusion as to the actual gain. Under the circumstances, we shall not disturb the respondent's determination that the gain was $50,561.95.

### BACK MAIL PAY.

#### *Issue (g), Docket No. 24887.*

The question here is whether any part of the payment of $15,706.62 received by the petitioner in 1920 as additional compensation for transporting United States mails during the period June 30, 1916, to December 31, 1917, which payment was made to petitioner under the provisions of section 5 of the Act of July 26, 1916, constitutes income for 1920. The disposition of this question is controlled by the principle of our previous decisions in *Old Dominion Steamship Co.* 16 B. T. A. 264; affd. 47 Fed. (2d) 148; *Illinois Terminal Co.*, 5 B. T. A. 15. See also *Western Maryland Railway Co.*, 12 B. T. A. 889. In any event, the order of the Interstate Commerce Commission of December, 1919, which we judicially notice, fixing the rate of compensation, must also be considered in determining whether there was an accrual prior to 1920. We therefore hold that the respondent erred in including $4,000 of the amount received in income for 1920, the taxpayer being on the accrual basis.

### ADDITIONAL COMPENSATION—FINAL SETTLEMENT WITH DIRECTOR GENERAL.

#### *Respondent's answer—Docket No. 24887*

The matter at issue here arises from affirmative allegations in respondent's answer to the amended petition, and calls for a decision as to whether the whole amount of $75,000 allowed to petitioner in final settlement with the Director General in 1920 as additional compensation for the use of properties known as the Jackson Extension, and the Blodgett Branch during the period of Federal control, or only a part thereof is income for 1920. The respondent contends that the whole amount received is income for 1920, while the petitioner contends that only $9,375 is income for 1920. The parties have stipulated that if the Board concludes that this additional compensation was earned during, and is properly to be accounted for as income of, the period of Federal control after the projects were

completed and placed in operation, the portion thereof applicable to 1920 is $9,375. The respondent concedes that the decision of this question is controlled by the decisions of this Board in *Illinois Terminal Co.*, 5 B. T. A. 15; *Cincinnati, Findlay & Ft. Wayne Railway Co.*, 5 B. T. A. 108; *New Orleans, Texas & Mexico Railway Co.*, 6 B. T. A. 436; *Great Northern Railway Co.*, 8 B. T. A. 225; *Old Dominion Steamship Co.*, 16 B. T. A. 264; affd. 47 Fed. (2d) 148; and *Kansas City Southern Railway Co.*, 16 B. T. A. 665; although the respondent does not concede the correctness of these decisions. The legal principle announced in the cited cases is that the compensation paid to a railroad company for the use of its properties during the period of Federal control is income for each of the accounting periods for which the compensation was allowed, although not received until a later date. The facts of record in this case clearly require the application of the same principle. Accordingly, the Board concludes that the compensation paid to petitioner for the use of the Jackson Extension and the Blodgett Branch was income for the several accounting periods for which the compensation was allowed, and, in accordance with the stipulation of the parties, the portion thereof returnable as income for 1920 is $9,375. Since no part of this compensation has been included by respondent in income for 1920, the net income for that year, as determined in the deficiency notice, should be increased by that amount.

RENTAL INTEREST ON COMPLETED ADDITIONS AND BETTERMENTS—
FINAL SETTLEMENT WITH DIRECTOR GENERAL.

*Respondent's answer—Docket No. 24887.*

The question at issue here arises from affirmative allegations in respondent's answer to the amended petition, and calls for a decision as to whether the whole amount of $56,521.02 allowed to petitioner in final settlement with the Director General in 1920 as rental interest on additions and betterments completed during the period of Federal control, or only a part thereof, is income for 1920. The respondent contends that the whole amount received is income for 1920, while the petitioner contends that only $13,439.61 is income for 1920. The parties have stipulated that if the Board concludes that this rental interest was earned during, and is properly to be accounted for as income of, the period of Federal control after the several projects were completed and placed in operation, the portion thereof applicable to 1920 is $13,439.61. The respondent concedes that the decision of this question is controlled by the decision of this Board in *Texas & Pacific Railway Co.*, 9 B. T. A. 365; *Indiana Harbor Belt Railroad Co.*, 16 B. T. A. 279; and *Kansas City Southern*

*Railway Co., supra,* although the respondent does not concede the correctness of these decisions. The legal principle announced in the cited cases is that rental interest paid or allowed to a railroad company on additions and betterments completed during the period of Federal control is part of the " just compensation " sought to be paid under section 4 of the Federal Control Act, as amended March 21, 1918 (40 Stat. 451), and is income for each of the accounting periods for which it was allowed, although not received until a later date. The facts of record in this case clearly require the application of the same principle. Accordingly, the Board concludes that the rental interest paid or allowed to petitioner as compensation for the use of additions and betterments completed during the Federal control period was income for the several accounting periods for which allowed, and, in accordance with the stipulation of the parties, the portion thereof returnable as income for 1920 is $13,439.61. Since no part of this compensation has been included by the respondent in income for 1920, the net income for that year, as determined in the deficiency notice, should be increased by that amount.

### INCOME FOR 1920 SUBJECT TO TAX RATES OF 8 AND 10 PER CENT.

*Issue (i), Docket No. 24887.*

In accordance with the stipulation of the parties, the admissions in the pleadings, and our decisions on the other issues raised in this proceeding, Docket No. 24887, we find that the consolidated net income for the two-month period, January and February, 1920, subject to tax at 8 per cent, is $40,946.70; and that the consolidated net income for the ten-month period, March 1 to December 31, 1920, subject to tax at 10 per cent, is $117,910.04.

### STOCK EXCHANGE FEE.

*Issue (a), Docket No. 42150.*

While there is no proof as to the amount of the fee paid by the petitioner for the listing of its capital stock on the New York Stock Exchange, the respondent makes the admission, in the brief, that the " cost of listing such stock was $2,400." The question of the deductibility of an expenditure of this sort in computing taxable net income has been decided by the Board, in *Dome Mines, Ltd.,* 20 B. T. A. 377, adversely to the petitioner; and upon authority of that decision, we hold that the respondent committed no error in refusing to allow this expenditure as a deduction from income for 1924.

## AMORTIZATION OF BOND DISCOUNT.
### *Issue (c), Docket No. 42150.*

The question whether a corporate taxpayer, having issued its bonds for a price less than their aggregate face value, may deduct a pro rata part of the discount in computing consolidated net income for a year in which such bonds were owned by its affiliated company, has been decided by the Board in *New Orleans, Texas & Mexico Railway Co.*, 6 B. T. A. 436, adversely to the petitioner; and upon authority of that decision we hold that the respondent, in computing the consolidated net income for 1924, 1925, and 1926, correctly disallowed the deductions claimed by the Meridian & Memphis for amortization of bond discount.

## DEPRECIATION OF WAYS AND STRUCTURES
### *Issue (e), Docket No. 42150; and (a), Docket Nos. 38295 and 42149.*

The respondent has disallowed the deductions for depreciation of ways and structures claimed by the Jackson & Eastern in its returns for the years 1923, 1924, and 1925, and for the period January 1 to August 15, 1926, and in the consolidated return for the period August 16 to December 31, 1926, on the ground that depreciation was being arrested by maintenance and repairs, renewals, and replacements, which were being expensed and allowed as deductions in computing taxable net income. The evidence presented on this issue leaves no room to doubt that, due to the character of construction of the ways and structures of the Jackson & Eastern, depreciation was not arrested by normal repairs and maintenance, renewals and replacements, and this is now conceded by the respondent in his brief. The costs of the various items comprising the ways and structures have been stipulated by the parties and are set forth in the findings of fact. Witnesses well qualified to give opinion evidence on the subject have testified as to the average life of each of the items included in the classification of ways and structures. Their opinions are supported by evidence as to the fact of abandonment and scrapping of these facilities, because of having reached the end of usefulness, due to normal wear and tear, after a life of only approximately ten years. On the evidence as a whole, we have found that the composite average life of these facilities was ten years. Accordingly, we hold the following amounts to be reasonable allowances for exhaustion, wear and tear for the years and periods in controversy:

| Year or period | Amount | Year or period | Amount |
|---|---|---|---|
| 1921 | $7,251.11 | 1925 | $17,768.28 |
| 1922 | 8,190.23 | 1/1/26 to 8/15/26 | 12,184.56 |
| 1923 | 11,361.87 | 8/16/26 to 12/31/26 | 7,407.35 |
| 1924 | 14,388.72 | | |

## Net Loss for 1921—Jackson & Eastern.

### Issue (b), Docket No. 38295.

The books of the Jackson & Eastern show a net loss for 1921 of $6,298.37. The petitioner reported a net loss of $1,567.41 in its return for that year. The difference of $4,730.96 represents an alleged loss charged off on the books in 1921, but not claimed as a deduction in the return for that year. There is no evidence as to when the alleged loss was sustained, and we can not assume that it was sustained in 1921 simply because it was recorded on the books in that year. Indeed, we can not find that there was an actual loss, since there is no evidence as to the cost of the retired equipment and the depreciation sustained during the period of its use. The alleged loss must be disregarded in computing the net loss for 1921. In computing the net loss, on the books and in the return, the petitioner made a deduction of $1,749.72 for depreciation of ways and structures. We have held that the deduction allowable for 1921 is $6,834.02. Accordingly, we find the net loss sustained by the petitioner for 1921, is $6,651.71.

The net income reported in the return for 1922, and accepted as correct by the respondent, was $5,684.86. In arriving at this net income, the petitioner made a deduction of $1,767.27 for depreciation of ways and structures. We have held that the deduction allowable for 1922 is $6,853.23. Accordingly, we find that the correct net income for 1922 is $598.90. In this connection it should be stated that the year 1922 is not before us for review, and we enter upon this determination solely for the purpose of ascertaining what part of the net loss sustained for 1921 is a proper deduction in computing the net income of 1923.

The net loss sustained for 1921 exceeds the net income for 1922, by $6,052.81, and such excess should be deducted in computing the net income for 1923.

### Donations to Y. M. C. A's.

### Issue (f), Docket No. 42150.

The petitioner claimed deductions in its returns for 1924, 1925, and 1926 of $866.67, $1,500, and $750, respectively, on account of contributions to Young Men's Christian Associations located at division terminal points. These institutions are not maintained on the petitioner's properties, and the petitioner's employees are not dependent upon them for any accommodations. They are maintained for, and in the interest of, the general public; and while the petitioner's employees avail themselves of the facilities of these institutions, they do not appear to be accorded any privileges not ex-

tended to the general public. The deductions in question were disallowed by the respondent. While there is no proof that the amounts in question were actually expended, the respondent makes the admission, in the brief, that such is the case. The petitioner, relying upon *Poinsett Mills*, 1 B. T. A. 6; *Lihue Plantation Co., Ltd.*, 2 B. T. A. 740; *Kekaha Sugar Co., Ltd.*, 13 B. T. A. 690; *Indiana Harbor Belt Railroad Co.*, 16 B. T. A. 279; *Terminal Railroad Association of St. Louis*, 17 B. T. A. 1135; and *American Rolling Mills Co.* v. *Commissioner*, 41 Fed. (2d) 314, contends that these contributions are ordinary and necessary expenses in carrying on its business. Considering all the facts in the case, we agree with the petitioner's contention. The use made of the Y. M. C. A. facilities by the railroad and its employees is sufficient to establish that the donations were ordinary and necessary expenses and are deductible.

### CONSOLIDATED NET LOSS FOR 1921.

#### *Issue (d), Docket No. 35898.*

The respondent determined that the Gulf, Mobile & Northern and the Meridian & Memphis sustained a consolidated net loss for 1921 of $147,753.83, and has deducted such net loss from the consolidated net income for 1922. In the petition, the petitioner made five assignments of error in the determination of the net loss for 1921, four of which were admitted by the respondent. The fifth challenged the correctness of the respondent's action in reducing the operating expenses for 1921 by $4,958.65, the amount credited on petitioner's books to " Transportation for Investment—Cr." account and charged to appropriate capital accounts. This action we have already held to be proper in the decision of the first issue considered in this opinion. Accordingly, we find that the consolidated net loss for 1921 is $64,701.79, which should be deducted in accordance with our opinion in the case of *Kaiwiki Sugar Co., Ltd.*, 21 B. T. A. 997.

In accordance with the stipulation of the parties at the hearing, we find that the net income of the Meridian & Memphis for 1922, is $18,461.06.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

STERNHAGEN, dissenting in part: The few facts available in respect of the back pay received in 1920 for mail transportation performed in 1916 and 1917 do not, in my opinion, justify the decision that it was not income in 1920. Furthermore, it seems to me more practi-

cal to treat controverted transportation charges which are in doubt during a protracted investigation by the Interstate Commerce Commission as income when received at the close of the controversy rather than to readjust the accounts of the year of service, and, since there is no legal obstacle to such a practical rule, I should adopt it rather than the cumbersome one now approved. The rule suggested in the dictum of the *Western Maryland* case will keep Government revenues and railroad taxes and income in a long state of uncertainty; and, in view of the statute of limitations, will probably be unfair and unsatisfactory to both.

ARUNDELL and MURDOCK agree with this dissent.

---

PHILLIPS, dissenting: I find myself unable to agree with the majority decision that the amount which the petitioner received from the United States Government pursuant to section 209 of the Transportation Act of 1920 is to be included as a part of its income taxable under the provisions of the Revenue Act of 1918.

The case of the Missouri Pacific Railroad Company, decided this day, presents a more complete picture of the extent to which this decision goes than is possible under the meager facts in this case. There the guaranteed amount appears as something less than $7,250,000. The company was paid over $13,500,000, making it clear that the payment, to the extent of some $6,000,000, was to replace actual losses of operation. The payment was not only to increase operating income to a certain point, it was to make good all losses of operations.

The circumstances which led to the enactment of this legislation are a matter of public record and of general knowledge. The railroads had been under Government operation for more than two years. Costs of labor and materials had reached unprecedented levels, and this was particularly true with respect to railroad labor. The impaired condition of maintenance of the roads and of the equipment had increased operating costs. Increases in rates had not kept pace with the increased costs of operation and, while it was recognized that higher rates would be necessary, it was also recognized that they could not be put into effect at once. Many of the railroads which had been on a paying basis before the period of Federal control were facing large deficits, while the earning powers of all were substantially impaired.

Adequate transportation was recognized as necessary to the wellbeing of the nation. The railroads had been operating primarily for the purpose of aiding the prosecution of the war and not for the

production of income. Their condition was attributable primarily to such operation and Congress recognized the necessity and the equity of granting some relief during the period of adjustment. The Federal Control Act and the agreements entered into thereunder had provided for the payment of compensation for the use of the roads and gave to the railroads all that they were constitutionally entitled to demand. The aid given them under the provisions of section 209 of the Transportation Act was nothing which they could have demanded and was not in settlement of any legal claim which they had. It was based upon the recognition of a moral or equitable obligation to provide some means by which the railroads might be compensated for the impairment of their earning power, caused by Federal control, until an opportunity had been granted, under private operation, to take the necessary steps to put rates and wages upon a business basis.

The term "income" as used in the Constitution and income tax laws has been defined by the Supreme Court as "the gain derived from capital, from labor, or from both combined, provided it be understood to include profit or gain from a sale or conversion of capital assets." *Stratton's Independence* v. *Howbert*, 231 U. S. 399; *Doyle* v. *Mitchell Bros.*, 247 U. S. 179; *Eisner* v. *Macomber*, 252 U. S. 189.

I believe that there is a very grave doubt whether such a payment, made to replace a loss of income without any legal obligation to do so, falls within the constitutional provision. *Edwards* v. *Cuba Railroad Co.*, 268 U. S. 628; *Bowers* v. *Kerbaugh Empire Co.*, 271 U. S. 170; *Rice, Burton & Fales* v. *Commissioner*, 41 Fed. (2d) 339; *Edward E. Marshall*, 10 B. T. A. 1140; *H. Sheldon Manufacturing Co.*, 13 B. T. A. 1296. If this be so, two well established rules of construction apply: the first, that statutes are to be construed to avoid doubts as to constitutionality; the second, that taxing statutes are not to be extended to matters not clearly included. Having these principles in mind, it seems to me that a proper construction of the Transportation Act requires us to reach the conclusion that the amount paid under its terms is not subject to income tax.

Paragraph (f) of section 209 of the Transportation Act provides the method by which railway operating income is to be computed. Subdivision (4) provides that there shall not be included in such computation such portion of the taxes paid under Title II or III of the Revenue Act of 1918 as by the terms of such act are to be treated as levied by an act in amendment of Title I or II of the Revenue Act of 1917. The effect of this provision can be understood only after reference to several other statutes. These we find quoted

and analyzed in the decision in *New York, Ontario & Western Railway Co.*, 1 B. T. A. 1172. The ultimate effect of the provision quoted is, as I understand it, as follows: The operating income for the guaranty period is reduced by a 2 per cent income tax, but is not reduced by the remainder of the income and profits tax imposed by the Revenue Act of 1918. The difference between the amount of the guaranty and the operating revenue as so reduced is to be paid to the carrier. By virtue of this provision the Government is to repay to the carrier a 2 per cent tax upon its operating income and the carrier is to bear the remainder of the tax upon its operating income. The Transportation Act thus expressly provides the extent to which taxes imposed under the Revenue Act of 1918 shall affect the payment to be made under the Transportation Act and the amount of the payment is dependent upon the amount of the tax. It is not reasonable to suppose that Congress, in thus providing that the amount of the guaranty payment should include a part of the tax levied under the Revenue Act of 1918 and should not include another part of the same tax, intended that such payment should again be reduced by paying a tax thereon under the same revenue act. The provisions of the Transportation Act and of the Revenue Act of 1918 are so interwoven that the two acts must be read together. When this is done a proper application of the rules of construction requires a holding that Congress intended the amount of the guaranty to be reduced by the taxes imposed by the Revenue Act of 1918 only to the extent expressly provided in the Transportation Act.

It seems to me significant that under the Federal Control Act (March 21, 1918) Congress, in providing for the payment of just compensation for the use of property taken over by the Government, inserted provisions for the taxation thereof and in the Transportation Act failed to provide that the payment by the Government should be taxable, while at the same time it provided in the Transportation Act for a division of the tax upon the actual operating income upon the same basis as was provided in the Federal Control Act for the tax upon all income. Had Congress intended that the basis for taxation prescribed in the Federal Control Act should continue with respect to the payments under the Transportation Act, it seems reasonable to suppose it would have so provided; instead of which, it provided for the continuance of such taxation only with respect to the actual operating income.

I am of the opinion that the Commissioner was in error in including such payment as a part of the gross income of the petitioner.