KAHUKU PLANTATION CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19156.   Promulgated June 29, 1928.

*Arthur A. Ballantine, Esq., Bernhard Knollenberg, Esq.,* and *S. Milton Simpson, Esq.,* for the petitioner.

*M. N. Fisher, Esq.,* and *L. C. Mitchell, Esq.,* for the respondent.

982

OPINION.

Phillips: During the years involved the petitioner was engaged in the operation of a sugar plantation on the island of Oahu, in the Territory of Hawaii. In the Hawaiian Islands a sugar crop matures in about two years. The cane is planted or ratooned during the spring and summer of the first year, cultivated during the second year and cut and ground in the third year. During each calendar year there are, therefore, three crops to be considered; the crop which is being harvested, the crop which is being started, and the intermediate crop, planted the previous year, which is under cultivation. Substantially all of the expenses incurred upon such a plantation are upon account of some one crop and may readily be charged against such crop. Expenditures made during the course of one year upon account of one crop differ from those made in the same year for the other crops and are of little or no benefit to such other crops. The acreage of crop planted varies from year to year, as does the cost of production and the price realized. Experience has shown that the only practicable method by which the results of operations may be gauged and profit or loss determined is to keep the accounts upon a basis by which the expenses of each crop are separately kept and are carried forward as a capital or asset item until the crop is harvested, when the entire expenditure is charged against the receipts from that crop. This system of accounting is known as the crop basis of accounting and during the taxable years was employed by the petitioner and by substantially all the plantations in the Hawaiian

Islands. It is expressly recognized in the regulations promulgated by the Commissioner, which read:

If a farmer is engaged in producing crops which take more than a year from the time of planting to the time of gathering and disposing, the income therefrom may be computed upon the crop basis; but in any such cases the entire cost of producing the crop must be taken as a deduction in the year in which the gross income from the crop is realized.

As herein used the term "farm" embraces the farm in the ordinarily accepted sense, and includes stock, dairy, poultry, fruit and truck farms, also plantations, ranches, and all land used for farming operations. (Article of Regulations 45, 62, 65 and 69.)

This regulation was issued pursuant to sections 212(b) and 213(a) of the Revenue Act of 1918 which provided in part:

SEC. 212. (b) The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income. * * *

SEC. 213. (a) * * * The amount of all such items [of income] shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under subdivision (b) of section 212, any such amounts are to be properly accounted for as of a different period; * * *

The subsequent revenue acts have contained similar provisions and the regulation has remained unchanged since it was first promulgated under the 1918 Act.

The crop basis of accounting is an adaptation of the voyage- or venture methods of accounting. Such methods of accounting go back to the earliest known history of voyages and are among the earliest known forms of accounting. They continue to play an important part in accounting theory and practice, particularly in those cases where the transaction involved is an isolated one, or the business transacted is a series of ventures maturing at regular or frequent intervals and is of such a nature that the result of a comparison of current receipts with current expenditures bears no fixed relationship to the true earnings of the accounting period. This principle of accounting has been recognized by the Board as proper in the case of a round-trip voyage of a vessel, where receipts for passage and freight received in advance of the voyage are to be offset by the expenses of the voyage subsequently incurred. *Falketind Ship Co.*, 6 B. T. A. 44.

There is no dispute between the parties that the crop basis of accounting is properly used in computing the income from sugar plantations in the Hawaiian Islands; the returns of petitioner were filed and audited and the deficiency computed upon the basis of such

method of accounting. The parties differ only as to its proper application to the facts in this case.

In January, 1920, the Japanese laborers on the plantations on the Island of Oahu went on strike. The greater part of the labor on that island and on the three other sugar producing islands in Hawaii was Japanese. The sugar industry looked upon this strike as a matter of the gravest character. It was believed that if the strike succeeded on Oahu, it would spread to the other islands. This was based on information that the strikers were largely financed by funds from the Japanese laborers on these other islands. The result was that concerted action was taken by all the Hawaiian sugar plantations through their organization, the Hawaiian Sugar Planters' Association.

It was seen that each plantation resisting the strike would sustain losses through it; possibly through direct property damage and certainly through inadequate labor supply, which would mean delay in harvesting the 1920 crop, poor cultivation of the 1921 crop, and a reduced area or defective planting and care of the crop to mature in 1922. The plantations as a group desired to make certain that the Oahu plantations would fight the strike to the end in spite of the damage and cost. With this in view, the Trustees of the Hawaiian Sugar Planters' Association, shortly after the outbreak of the strike, agreed on behalf of the Association to indemnify the plantations affected by the strike for losses sustained in resisting the strike, and these plantations agreed that they would be guided by the decisions of the Association in the handling of the strike resistance.

It soon became apparent that the strike was likely to continue for a considerable period, and the Association desired to keep fully advised at all times during its progress as to the losses resulting therefrom. Consequently, on February 16, 1920, the Trustees of the Association authorized the President to appoint " an independent committee  *  *  *  to make a survey and determine the conditions on the plantations and maintain a record from day to day so that the real facts " (as to the strike losses) " may be known," which Committee was thereafter appointed. This Committee appointed experts from the technical staff of the Association, who remained continuously at the plantations affected by the strike and made regular notes as to the conditions of growth of the cane, the irrigation conditions and other matters bearing on the effect of the strike upon the growing crops.

The resistance to the strike was successful, and by the end of July the strike was practically over and substantially all of the strikers remaining in the Islands had returned to work.

The Strike Claims Committee then took up in detail the matter of determining the amount of the losses occurring on each plantation with respect to each crop affected. On November 17, 1920, the Com-

mittee as a result of their work presented to the Trustees a detailed form to be employed by the plantations in submitting their claims for strike losses. The items going into the tabulation of net loss were intended to be such as to put these plantations upon the basis which would have existed had there been no strike. In the case of the petitioner the amount paid it was summarized upon one of these forms as set out in our findings.

The largest item in the computation is the loss from receipts. In the case of the 1920 crop, this was due principally to the delay in harvesting the crop. Because of this the cane did not produce the quantity of sugar which would have been obtained had it been harvested at the proper time, and the sugar was marketed late. The probable loss in tonnage was determined by the experts from the staff of the Planters' Association. But the principal loss in receipts in 1920 was due to the collapse in the price of sugar during the latter part of 1920, the strike having delayed the plantations affected in getting their crop to market. The date when the raw sugar would have been ready for shipment was determined from date of previous years. The price which the normal crop shipped at the usual dates would have brought, after the payment of shipping costs, was computed and compared with the amount realized. The loss in receipts from the 1920 crop was determined to be $344,775.48. The loss in receipts from the 1921 crop was determined by applying to the tonnage of sugar that would be lost by reason of inadequate cultivation during the strike, a price of 8 cents per pound. This was considered to be a fair average of the prospective price for the 1921 crop. The probable loss in tonnage was determined by the experts on the staff of the Association on the basis of the survey by them of the growing crop, made at frequent intervals during the strike and subsequently during 1920. The estimate of the price of sugar in 1921 was fixed by the Trustees of the Association. The loss in receipts from the 1922 crop was determined in the same manner. The principal cause of the reduced tonnage in this crop was the decrease in the acreage planted and the delay in starting the crop with a consequent shortening of the growing period.

The items of losses from operations represent the increased cost of field operations, such as clearing, planting, hoeing, irrigating, fertilizing, cutting, loading, transportation of cane from field to mill, and other increased labor costs. The computation of the increased cost was based on the average cost of the same operations for the three preceding years.

The item of gain from bonus, which occurs only in 1920, represents the amount of bonus which would have been paid to laborers under normal operations but which was not paid because of the strike. Such bonus is based upon the price received from sugar.

The gains from rents represent the difference between the rentals which would have been paid on the receipts from a normal crop, as estimated, and those payable on the basis of the receipts from the reduced crop which would be harvested in each of the crop years. Rentals were payable upon the basis of a fixed percentage of the crop.

The amounts included under miscellaneous losses consisted of such items as increased cost of fuel oil for the mill furnaces—due to the irregularity with which the crop was harvested, extra amounts paid for police, losses of amounts advanced to former employees who went on strike and left the plantations without paying such advances, and other items which were not considered ordinary agricultural expenses.

In computing each item there was charged against it any saving which would be effected. For instance in the case of the 1922 crop, a gain from operations was computed. In this case the crop was late in planting and was smaller in amount and while it would yield less, it would also require smaller expenditures for irrigating, cultivating, fertilization and harvesting than would a normal crop. The amount saved in this manner over the amount which would have been expended on a normal crop was treated in the computation as a gain.

That items of income need not necessarily be included in gross income of the year when received is recognized in section 213(a) of the Revenue Act of 1918, which, after stating what is to be included in gross income, provides:

* * * The amount of all such items shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under subdivision (b) of section 212, any such amounts are to be properly accounted for as of a different period; * * *

When the method of accounting employed is the so-called crop method, the cost of planting, cultivating, and harvesting of the crop and all other expenses incidental to the production and marketing of the crop are charged to one account, usually denominated "crop account," and the receipts from the sale thereof are credited to the same account. The usual practice, which was followed in this case, is to carry a separate account for each crop. The balance in the crop account is carried upon the books and into the balance sheet as an asset or liability until the total receipts and expenditures can be ascertained, whereupon the balance, representing the profit or loss upon the crop, is carried into the profit and loss statement and the crop account closed. In such circumstances a proper balance sheet will show as an asset the amount invested in each crop which has not yet been harvested and the profit and loss statement will reflect the result of the crop harvested in the current year, without attempting to estimate in any way the profit or loss on crops in the ground. The situation is comparable with that of a manufacturer who inventories at cost those goods produced in his factory. The

principle of this method of accounting is to bring into the crop account all receipts from that crop and all expenses chargeable to that crop. If an item of income or expense relating to the crop is excluded from the crop account, this will necessarily disturb the accuracy of the accounting and will result in showing a net gain or loss from that crop different from the true net gain or loss. The same would be true of any accounting system based upon the principles of venture or voyage accounting.

Under such a method of accounting, receipts are not to be treated as income or payments treated as expenses until the sale or other disposition of the crop is substantially completed and its outcome is known. Thus, receipts from a crop in a year prior to that in which that crop is completed are not accounted income until the year of sale or other disposition of the crop. Additional expenses will arise, in connection with the producing, harvesting and marketing of the crop, until the sale or other disposition is completed, or substantially so, all of which are incidental to the earning of the gross income represented by the receipts from the crop.

The parties do not question that these are the proper principles to be applied in this case and these principles have, we believe, the unqualified support of standard works of accounting. The respondent, however, contends that the receipts in question are not, in fact, receipts from the crop but an award made by the Association for the privilege of conducting the strike in such a manner that the outcome would benefit all of its members. The amount of the award, says the respondent, was not income from the crops and had no connection with them save that they were employed as a means of measuring the amount to be paid under the agreement between the Association and the planters. Petitioner, on the other hand, contends that the payment was awarded for specific losses to each of the respective crops.

That the payment may have been liquidated damages for the privilege of conducting the strike would not prevent it from going into the crop account if it was made in respect of the crop. Receipts from hail insurance for damages to crops, insurance for loss of receipts from freight, insurance from the partial destruction of goods involved in a venture, are all treated as receipts from the crop, voyage or venture. The question to be determined is whether the payment was in fact a receipt arising out of the crop.

It can not be questioned that the strike did have its effect upon the crops in question. The tonnage of sugar produced was reduced, the cost of the necessary labor during the strike was increased, and the cost of cultivation in the period following the strike was increased, for the testimony is that a late or neglected crop requires greater attention than a normal crop. The expense already incurred was rendered of less value than would have been the case under

normal circumstances. We are thus presented with a situation where receipts are reduced and expenses increased. The award made by the Planters' Association represented a computation, based on the best available data, of the amount by which receipts and expenses were affected and a balancing thereof. A balance so arrived at is in no true sense net income, for it must be considered in connection with other expenditures made or to be made and other receipts to result from the crop before we may determine whether any part represents a gain. It may well be that under normal conditions a loss would have resulted from the crop, and the payment is no more than a reduction in the amount of such loss. So long as it relates to a crop planted it represents nothing but a computation of the net loss in receipts. To refuse to consider such an item in computing gain or loss from the crop is to distort the gain or loss from that crop. It is just this which the Revenue Act seeks to avoid.

We have said that the parties, the Commissioner's regulations, and the accounting authorities are agreed that amounts received from hail insurance for damage to a crop are to be reported as a part of the crop income. The basis for the computation of the damage in such a case is precisely that followed in this case. The courts hold that the recovery under a policy insuring growing crops against damage is the market value of the crop destroyed, less the expense of preparing it for market. The loss in bushels, less the cost of maturing, harvesting, and marketing may be shown as indicating the amount of the loss. *Barry* v. *Insurance Assn.*, 110 Iowa 433; 81 N. W. 690; *McIlrath* v. *Insurance Assn.*, 114 Iowa 244; 86 N. W. 310. This is the measure which was used in this case and we see no difference in principle between a payment for losses by hail and a payment for losses from a strike. It is true that in either case the amount received represents gross income, but it does not represent a profit; and until the crop for the year is completed it can not be known whether there has been a profit or a loss. Under the crop system of accounting, the receipt from this source must be considered with the other receipts from the crop, and compared with the expenses.

It is claimed that the expenses of the crop have no connection with the amount awarded. This overlooks the fact that the starting point of the award was the amount to be received from the crop under normal conditions, and that such a crop can be produced only by reason of such expenditures.

It is our opinion that to the extent that the award was for losses to the crop, it is to be considered as a receipt from that crop and accounted for as such. It appears that the amount awarded for 1921 was entirely on account of damage to the crop to mature in that year. We find, however, that in computing losses to be paid on the 1922 crop, consideration was given to the smaller acreage which was planted. Any amount which was included in the com-

putation for that reason does not represent a receipt from the 1922 crop, but rather a payment in the nature of a reimbursement for profits foregone. It is a payment of the estimated profits on acreage never planted and comprising no part of the crop. It represents income of the year when received and not income from a future crop for it can not be said to be in any true sense a payment arising from petitioner's crop for 1922. There is no basis on which we may determine how much of the payment made on account of 1922 represents reimbursement for the net loss of receipts from the crop of that year, and how much represents a computation of profits on the acreage which was not planted. The computation made by the Association is such as to lead to the belief that a substantial portion of the payment falls in the latter classification. We are of the opinion that the payment of $17,413.44 on account of the net losses to the 1921 crop is properly to be accounted for as a receipt on account of the crop of that year, to be used in determining the income from that crop and that it was erroneously included by the Commissioner in computing the taxable income for 1920. The action of the respondent with respect to the payment for 1922 losses is approved.

Counsel for the respondent place reliance upon the decision of the Circuit Court of Appeals for the Ninth Circuit in *Ewa Plantation Co.* v. *Wilder*, 289 Fed. 664. In that case the court had for decision the proper treatment under the Hawaiian income-tax law of these strike-loss payments. It decided that the entire payment was income for 1920. The difference in the situation, however, appears from the opinion where it is said:

The inference is not deducible from the decisions of the Supreme Court of Hawaii that income actually received in one year is not taxable as income of that year but is to be carried into the income of another year.

The statute which governs this case provides in express terms for precisely that which the court finds missing in the Hawaiian statute. The underlying principles of the two statutes are so divergent, so far as they affect the treatment of this payment, that the decision can not be considered as controlling here. The court also points out in that case that the amount paid was compensation or liquidated damages for losses sustained. Counsel for respondent argue from this that the amount was income. Unquestionably so, but this does not decide the question for it must still be determined whether this payment of compensation or liquidated damages for losses was for losses to the crop of a future year to the extent that it constitutes a payment received out of that crop. This we have done.

Reviewed by the Board.

*Decision will be entered under Rule 50.*