Ralph Spitcaufsky and Jean Spitcaufsky v. Commissioner. Hyman Spitcaufsky and Bertha Spitcaufsky v. Commissioner. Ralph Spitcaufsky v. Commissioner. Hyman Spitcaufsky v. Commissioner. Bertha Spitcaufsky v. Commissioner.
Spitcaufsky v. Commissioner
Docket Nos. 38674-38676, 38699, 38700.
United States Tax Court
1954 Tax Ct. Memo LEXIS 326; 13 T.C.M. (CCH) 32; T.C.M. (RIA) 54027; January 20, 1954
Harry A. Hall, Esq., and A. Henry Cuneo, C.P.A., 700 National Fidelity Life Building, Kansas City, Mo., for the petitioners. David Karsted, Esq., for the respondent. JOHNSON
Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent has determined the following deficiencies in income tax: Docket No.
Petitioner
Year
Deficiency
38674
Ralph and Jean Spitcaufsky
1947
$ 917.89
1948
4,869.38
38675
Hyman and Bertha Spitcaufsky
1945
309.02
1946
758.38
1948
4,075.74
38676
Ralph Spitcaufsky
1945
1,108.17
1946
3,879.00
38699
Hyman Spitcaufsky
1947
379.02
38700
Bertha Spitcaufsky
1947
76.00
*327 The issues presented are: (1) Was it the intention of the parties that Jean Spitcaufsky be a bona fide partner in the Ralph Spitcaufsky Equipment Company for the calendar years 1945 and 1946? (2) Was the sum of $9,449.33 expended by the Ralph Spitcaufsky Equipment Company in 1948 for inventory? (3) Did the method of accounting regularly employed by petitioners for the Granite City Deal clearly reflect income? (4) Was one-fourth of the expenses for an apartment house personal expenses, or allowable deductions from 1945 through 1948? (5) What was the proper rate of depreciation for an apartment house from 1945 through 1948? (6) For the years 1945 through 1948 did Ralph Spitcaufsky have unreported income? Findings of Fact Ralph Spitcaufsky and Jean Spitcaufsky, his wife, hereinafter referred to as Ralph and Jean, and his parents, Hyman and Bertha Spitcaufsky, are residents of Kansas City, Missouri. For the years 1945 through 1948 they filed their returns with the collector of internal revenue for the sixth district of Missouri. Issue 1 - Partnership Findings of Fact. - Ralph for some 20 years had been in the business of buying and selling used machinery and building *328 equipment, and during part of this time he was in partnership with his father and operated the Globe Construction Company. On September 22, 1942, Ralph, Jean, and his parents executed a partnership agreement. Under the terms of this agreement the name of the partnership was to be the Ralph Spitcaufsky Equipment Company, hereinafter sometimes referred to as the partnership or the Equipment Company. The Equipment Company was to engage in the business of buying and selling used machinery and equipment. Each party executing the agreement was to have an equal interest in the partnership. Contemporaneous with the signing of the agreement Jean and Ralph's parents each executed a noninterest bearing note in favor of Ralph for $4,250, payable only out of business profits. In general the terms of the agreement provided that Ralph was to be the general manager of the business and, if he were inducted into military service, other provisions for the management of the business were made. Partnership books were to be kept and were to be available to each of the partners. None of the parties, except Ralph, without the consent of the others, was permitted to assign, transfer, pledge, compromise *329 or release any of its claims or debts except in the ordinary course of business, nor execute any assignment for the benefit of creditors, hire, purchase, sell or mortgage any real property, or borrow or loan money. The net profits were to be divided and all losses were to be borne equally by the parties to the agreement. The assets of the partnership were contributed by Ralph in an amount of $17,000. Each one of the parties executing the agreement allegedly acquired a one-fourth interest in this capital upon the execution of his or her promissory note for the amount of $4,250. The accounting for the capital contribution of Ralph and Jean was as follows: in Jean's capital account there was a debit dated March 31, 1943, "Pchse note CJ 54 4,250.00", and a credit to Ralph's account on the same date, "Partners' Pchse Money Notes CJ 54 12,750.00." Partnership returns for the years before us were filed with the collector of internal revenue for the sixth district of Missouri. Beginning in 1942 respondent refused to recognize Jean as a bona fide partner in the business and attributed her share of the partnership income to Ralph. For the years 1942 through 1944 this adjustment was agreed *330 to by petitioners. From the year 1947 Jean was not claimed by the partnership as a partner. However, her capital account and personal account on the partnership books were not closed until December 31, 1947. When Jean's capital account was closed, the closing entry was a debit on December 31, 1947, "To close acct J-18 7,439.33", and a credit entry on the same date to Ralph's account without any explanation in the amount of $7,439.33. No money or other consideration was given to Jean when her account was closed. Jean's personal account showed withdrawals of $13.87 in 1944, $6.83 in 1945, $3 in 1946, and $9.50 in 1947. All debits to her capital account except one for "1/2 cost of residence CJ 80 5,750.00", another for the partnership purchase note and the above-mentioned withdrawals, were for income tax payments. Jean and Ralph were married in 1937 when she was 17 years old. Prior to her marriage she had worked in a department store, but after her marriage she helped out in the partnership business by doing general office work. She had no regular hours, and she was not responsible for any assigned work. The parties did not in good faith with a business purpose intend to make Jean *331 a partner in the Ralph Spitcaufsky Equipment Company, and she was not a bona fide member of the partnership for Federal tax purposes. Opinion. - The sole question here is whether Jean, Ralph's wife, was a partner in the Ralph Spitcaufsky Equipment Company in 1945 and 1946. This is another of the many situations where the form of business was a partnership, but where the intent of the parties, gleaned from all the facts was not reflected by the business form. Here, it must be determined whether the parties in good faith and acting for a business purpose intended that Jean be a partner in the Equipment Company. Aside from the partnership agreement there is no convincing evidence that the parties intended in good faith and for a business purpose that Jean be a partner in the business. In reviewing the record we find that Jean's services were neither vital nor regular. Jean occasionally helped out with the office work just as many wives help their husbands in their business activities. She had no regular hours; no regular duties or responsibilities. There is no evidence that Jean participated in the management or the control of the business. We have no record that she participated *332 in business discussions or helped formulate policy. She did not contribute any original capital. While this in itself is not controlling, it is one of the elements to be considered in determining the true intent of the parties. Jean did not receive a salary nor withdraw money other than nominal sums for her individual and personal use during the years in question. The record does not sustain a finding that she was held out to the public as a partner in the business and, finally, a most significant fact, when her capital interest in the business was transferred to Ralph in 1947, the only evidence of the transfer or exchange was a bookkeeping entry. Jean received no money or other consideration for her alleged partnership interest in the business and at the time of the transfer her interest had a book value of $7,439.33. From the record we can only conclude that Jean was not a bona fide partner in the Ralph Spitcaufsky Equipment Company in 1945 and 1946. On this issue the respondent must be sustained. Issue 2 - Inventory Findings of Fact. - In 1945 Ralph, his uncle, and two others formed a partnership known as the Ace Sales and Equipment Company, hereinafter referred to as Ace *333 Sales; the partnership bought and resold used machinery and equipment. The same four also formed another partnership known as the Blue Valley Rock & Machinery Company, hereinafter referred to as Blue Valley, which engaged in a mining and rock crushing business. The partners, other than Ralph, made equal cash contributions to provide the original capital of $51,500 for Ace Sales. Blue Valley was formed subsequent to the formation of Ace Sales to operate some of the equipment owned by Ace Sales. Ralph was to manage the businesses; the profits and losses were to be shared in the ratio of 40 per cent for Ralph and 20 per cent for each of the other three partners. Ace Sales continued in business for three years but it was not successful in making money. In 1948 when the business needed operating capital Ralph sought to obtain it from his partners, but they would not add to their original investment. As an alternative, he considered the possibility of buying their interests. In furtherance of the plan to buy their interests he inventoried the assets and liabilities of the business. In general Ralph determined the assets to be worth approximately $73,000, the liabilities $46,000, with a *334 resulting net worth of $27,000. Ralph determined that among the assets there was an inventory of stock in trade worth $46,000. However, two of his partners thought that the inventory was worth more than $46,000. After some discussion these two agreed to sell their interests to Ralph for $55,449.33. Ralph agreed to their terms and acquired their interests in Ace Sales and Blue Valley. At a later date Ralph also acquired his uncle's interest in the business. After Ralph paid his partners for their interests in the business he made an entry in the merchandise purchases account on the books of the Equipment Company in the amount of $55,449.33 ($46,000 plus $9,449.33). This figure represented the actual amount of money paid out by Ralph for the newly acquired interest in Ace Sales and Blue Valley, and the $9,449.33 was properly includible in the merchandise purchases account. Respondent increased the 1948 net income of Ralph and Jean by the following adjustments: Unallowable deductions and additional income: (a) Increase in partnership income
$17,456.71
(b) Increase in rental income
606.79
(c) Interest income
100.00
(d) Unreported income
450.00
(e) Increase in net capital gains
1,500.00
*335 Opinion. - In the second issue there is no dispute as to the fact that a certain sum plus $9,449.33 was paid by Ralph to two of his former partners in 1948; however, respondent contends that the $9,449.33 was paid for a purpose other than as part of the purchase price of the assets. See Majestic Securities Corporation, 42 B.T.A. 698; affd., 120 Fed. (2d) 12; New Hampshire Fire Insurance Co., 2 T.C. 708; affd., 146 Fed. (2d) 697. On the other hand, Ralph maintains that the $9,449.33 in question was paid by him "on account of the excess value of the inventory over the cost value recorded on the books" of Ace Sales and Blue Valley. He then concludes that under section 23 (a) (1) (A), I.R.C., the payment was deductible as an ordinary and necessary business expense. There is a conflict in the theory underlying petitioners' argument. If the $9,449.33 was paid because of the increased value of the inventory, then that amount must be attributed to purchases of inventory, and it must be considered as part of the cost of goods sold when computing net income. This same sum can not also be considered as an ordinary and *336 necessary business expense and deductible under section 23 (a) (1) (A) when determining net income. The use under one theory precludes the use under the other. There wasclear and unequivocal testimony that the $9,449.33 was paid to satisfy the sellers' demands that the stock in trade was worth more than Ralph estimated it to be worth. Therefore, an addition to merchandise purchases in the amount of $9,449.33 would be proper on Ralph's books. We see no difference in a comparable situation where the buyer purchases the good will or other asset of a going business. If the good will or other asset was purchased it would be properly set up as good will or other asset on the books of the buyer. Likewise, in the present case, when the partners agreed that the value of certain stock in trade was worth more to the buyer than to the sellers, and the sellers' price was met, the basis of that stock in the buyer's hands was his cost and should be so set up on his books. See section 113. In arguing his contention on brief for this issue, respondent would have us believe that Ralph paid this additional sum as a possible extortion payment or for some other reason. We have carefully considered *337 this theory, but in the absence of affirmative proof which would cast doubt on Ralph's testimony, we can not accept respondent's argument. On the other hand, when Ralph demonstrates that the expenditure of $9,449.33 was for stock in trade, we can not find that the sum was also a deductible business expense. On brief petitioners state that the Ralph Spitcaufsky Equipment Company purchased the interests in Ace Sales and Blue Valley while respondent's requested findings of fact are written under the theory that Ralph purchased both companies. In the petition Ralph alleged that he represented the Equipment Company when he purchased Ace Sales and Blue Valley; respondent's answer denies this allegation. No evidence was presented to sustain these allegations; however, respondent does admit that the entry on the merchandise purchases account was an entry on the books of the Equipment Company. An examination of the adjustments to Ralph's 1948 income reveals that the respondent's adjustments resulted from an increase in the distributive share of the Equipment Company income, rental income, interest income, unreported income, and capital gains. None of these increases can be attributed to Ralph's *338 activity as an individual dealing in the interests of Ace Sales and Blue Valley; however, the adjustment for Ralph's distributive share of the Equipment Company income does reflect the adjustment for the $9,449.33. On this entire record it is proper for us to conclude that Ralph represented the Equipment Company when he purchased his partners' interest in Ace Sales and Blue Valley. Further, the $9,449.33 was paid for stock in trade and was properly includible on the Equipment Company's merchandise purchases account for 1948. Issue 3 - Joint Ventures Findings of Fact. - In addition to buying and selling used machinery and equipment in its own right, the Ralph Spitcaufsky Equipment Company entered into business arrangements with other individuals to buy and sell equipment. These business arrangements were known as "outside deals", "joint ventures", or "joint venture deals". These ventures were generally restricted to a single transaction and it was independent of the regular Equipment Company business. The individuals interested in the ventures other than the partners of the Equipment Company were not financially interested in the Equipment Company or its regular business. *339 In the ventures in which the partners of the Equipment Company were involved, the partnership bid for, purchased, and sold the venture stock in trade in the name of the Equipment Company. The Equipment Company collected and distributed the proceeds from venture sales, and it commingled these proceeds with its own money. Though venture business was conducted in the name of the Equipment Company, all transactions relating to a single venture were recorded on a single ledger sheet on the books of the Equipment Company; a separate account was set up for each venture. In the accounting for venture transactions, all purchases and expenses, including withdrawals, were charged to the venture account. All sales were credited to this account. Under this method of accounting venture profit or loss was not computed until all of the equipment purchased for that particular venture was disposed of or sold. There was no annual accounting to determine annual profit or loss for these ventures. In the fall of 1947 the Equipment Company and M. J. Donohue entered into a business agreement known as the Granite City Deal. Acting under this agreement, on or about October 28, 1947, the Equipment Company *340 purchased from the War Assets Administration, hereinafter referred to as W.A.A., an asphalt mixer, a back hoe attachment, two tractor winches, and 354 power units for tractors. Prior to the submission of the bid for this equipment Ralph and Donohue inspected the equipment, and for the purpose of computing an aggregate bid price they placed an estimated value on each item offered for sale. On their aggregate bid of $53,805 they were awarded the contract. But later, on a claim for missing and defective parts, they received a refund of $5,000, less attorneys' fees and costs of $1,935. Ralph was designated manager of this venture. The machinery and equipment were stored on the premises of the Equipment Company but were segregated in such a way that the items belonging to the venture could be picked out and identified. Ralph kept the books and on November 31, 1947, an account "Joint Venture - M. J. Donohue & Ralph Spitcaufsky Equip. Co. on Equipment Purchased from W.A.A. at St. Louis, Mo. on Bid #" was opened for this venture. One of the transactions of the venture was a sale of 10 power units to the Reicke Equipment Company in exchange for a truck and scraper of a combined value of *341 $4,500. The truck and scraper were still held by the venture on September 1, 1949. In the fall of 1949 Donohue, who was primarily a contractor, wanted to get out of the venture and he interested another party in the purchase of his share of the venture assets. When Ralph heard of Donohue's contemplated sale, he offered to buy Donohue's interest. By a written agreement dated February 20, 1950, Ralph agreed to purchase Donohue's interest for $6,000, payable on that date, and a balance of $6,500 to be paid at the rate of 25 per cent of future sales on equipment sold out of their venture. In making the adjustment to Ralph's income from this venture, respondent first computed the profit from the venture as follows: Gross Sales (12/1/47 to 9/1/49)
$59,229.40
Cost of Sales: Purchases and other
costs
$56,690.84
Less: Inventory 9/1/49
28,677.18
28,013.66
Profit from venture to 9/1/49
$31,215.74
Next, respondent determined the annual sales, and from this the per cent of yearly sales to total sales. The per cent of yearly sales times aggregate profit gave him annual profit. Respondent then determined the amount and the per cent of annual sales proceeds *342 retained by the Equipment Company. This per cent times annual profit gave respondent a figure representing annual profit to the Equipment Company, as is shown in the following tables: Per cent of
Venture
yearly sales
Profit from
Annual
Year
Sales
to total sales
X Venture
= Profit
1947
$ 2,700.00
4.56%
$31,215.74
$ 1,423.44
1948
39,480.90
66,66%
31,215.74
20,808.41
1949 *
17,048.50
28.78%
31,215.74
8,983.89
$59,229.40
100.00%
$31,215.74
Sales proceeds
Per cent of sales
Annual
retained by
proceeds retained
Annual
profit to
Year
Equipment Co.
to annual sales
X Profit
= Equipment Co.
1947
$ 2,700.00
100.0%
$ 1,423.44
$ 1,423.44
1948
38,980.90
98.7%
20,808.41
20,537.90
In February 1948 the Equipment Company, acting under authority of an agreement between it, Donohue and Melvin Spitcaufsky, entered into the "Al Fischel Deal". In this venture four pieces of equipment, three trucks and one scoop shovel, were purchased from Al Fischel for $19,000. The management of this venture and the accounting for the sales and expenditures were handled in the *343 same manner as the Granite City Deal, that is, Ralph was responsible for the sales and the accounting for the sales. During 1948 three pieces of equipment from the Al Fischel Deal were sold for an aggregate of $19,050, and in 1949 the fourth piece was sold for $6,500. The expenses incurred in 1948 amounted to $907.35, and those in 1949 amounted to $1,350. In 1949 the parties received a distribution of the profits from the venture as follows: M. J. Donohue
$1,225.00
Melvin Spitcaufsky
1,050.00
Ralph Spitcaufsky Equipment
Co.
2,017.65
Respondent determined the income taxable to petitioners for the years 1947 and 1948 from each venture was as follows: Granite City
Al Fischel
Year
Deal
Deal
1947
$ 1,423.44
1948
20,537.90
$1,698.38
Opinion. - One of the first questions to be considered in the third issue is what were the business forms of the Granite City Deal and the Al Fischel Deal. Neither party maintains that they were partnerships as such. However, respondent maintains that the business was a joint venture and under section 3797 (a) (2), 187 and 182, I.R.C., [1] the parties are taxable as partners. Petitioners *344 contend that the business forms were "joint venture deals" and are not joint ventures within the statute. Petitioners maintain that the deals were merely a form of doing business whereby the parties were compensated either for services or for capital by a distribution of the net profit. Actually there is no need for us to determine the business form of these deals. The only issues which arise from the business transactions are what are petitioners' share of the profits, and here the business form does not determine their share of the profits. However, for purposes of discussion, we shall denominate these transactions as ventures. *345 In this third issue respondent contends that the method of accounting employed by petitioners in their ventures did not clearly reflect income. Respondent determined that the use of inventory was necessary to clearly reflect annual income from their ventures. Therefore, respondent determined the value of the inventory of the property remaining in the Granite City Deal as of September 1, 1949. The value of the inventory was based on petitioners' cost of the property. That is, where petitioners in their original bid to the W.A.A. valued certain property at $150, respondent used this same figure in determining the September 1, 1949, inventory. Respondent determined that the accrued profit of the Granite City Deal from November 31 1947, to September 1, 1949, was $31,215.74. This profit, plus the profit from the Al Fischel Deal, was allocated over the years and taxed to the parties on the basis of the per cent of annual sales proceeds received and retained by each to the total of such sales proceeds. Now, reviewing petitioners' contentions, we find that they maintain that their method of accounting is also known as the "venture method"; the "voyage method", Falketind Ship Co., 6 B.T.A. 44; *346 the "crop method", Kahuku Plantation Co., 12 B.T.A. 977, Kekaha Sugar Co., 13 B.T.A. 690; modified in part, 50 Fed. (2d) 322; the "completed contract method", Fort Pitt Bridge Works, 24 B.T.A. 626; affd., in part. 92 Fed. (2d) 825, and the "recovery-of-cost method", William T. Piper, 5 T.C. 1104. They conclude that this method is acceptable for income tax purposes. We agree with petitioners that the form of their accounting was similar to the many types mentioned but their business activities, which consisted of buying and selling machinery, were vastly different from the business activities of operating a ship or raising a crop. We think the very nature of a merchandising operation may require a taxpayer to use a different form of accounting than that used in a shipping or farming venture. Petitioners' analogy to a completed contract method is without merit. The propriety of a completed contract method rests upon the theory that when a taxpayer is not entitled to certain income until a contract is completed, he may not be taxed on that income until the contract is completed. A factual situation which *347 requires this method of accounting does not exist here. In a merchandising operation, such as we have here, there may be gain or loss, or neither, on every individual transaction. There remains the applicability of the recovery-of-cost method. If this method is to be applicable, apportionment or allocation of the cost of the items purchased must be wholly impracticable or impossible. William T. Piper, supra, and Inaja Land Co., 9 T.C. 727. Again, a situation requiring the use of this method is not present. In the Granite City Deal the fact is that each item purchased was given a value for the computation of the bid submitted to W.A.A. Therefore, an apportionment or allocation of the cost of each item held by the petitioners could reasonably be based on their original cost and a determination of the value of their annual inventory would not be impracticable or impossible. Petitioners' argument, that where property is acquired as a whole, gain or loss is not realized until all the property is disposed of, even though it be disposed of in parcels, has been refuted many times. Such contentions are inconsistent with the theory of tax laws which are designed *348 to levy taxes upon gains and profits for annual periods. Heiner v. Mellon, 304 U.S. 271; see Healy v. Commissioner, 345 U.S. 278. It is now well settled that where property is acquired as a whole, for a lump sum, and subsequently disposed of a portion at a time, there must be an allocation of the cost or other basis over several units, except where apportionment would be wholly impracticable, and gain or loss computed and reported upon the disposition of each part. T. H. Symington & Son, Inc., 35 B.T.A. 711, 737; Nathan Blum, 5 T.C. 702, 709; Oliver Iron Mining Co., 13 T.C. 416, 418. With regard to the Granite City Deal, we think that petitioners' method of accounting and reporting income did not properly reflect income on an annual basis. See Regulations 111, section 29.22 (c)-1. Further, we do not think that it would have been impracticable to determine an annual inventory on a cost or other basis. Petitioners knew what value they placed on each item when they submitted the bid, and adjustments for depreciation or appreciation could be made when computing annual inventory. Since they knew the number of items on *349 hand at the end of each year and the value of these items, they could have determined an annual inventory. Respondent's contention that petitioners did not properly report income on an annual basis on the Granite City Deal must be sustained. Under respondent's rationale that income was improperly reported, he allocated a part of the aggregate income from the Granite City Deal to 1947 and 1948. His method and computations are set out in our findings above. Petitioners objected to the allocation because (1) they alleged that the respondent was arbitrary in using September 1, 1949, as a cut-off date; (2) that there was no relation between cost and actual value of the inventory; (3) respondent's formula for determining petitioners' profits allocated 96 per cent of the net income to petitioners when they were in fact entitled to only 75 per cent; and (4) they allege that there was no gain in the transactions with the Reicke Equipment Company when $4,500 of equipment was exchanged for a truck and scraper valued at $4,500. We shall consider these objections in the order presented. Even if we were inclined to accept petitioners' argument that the cut-off date was arbitrary, we do not *350 see how a cut-off date of September 1, 1949, will affect net income of 1947 and 1948 provided the gross sales up to that time were properly recorded and accounted for, and the value of the inventory on that date was correct. Nor have petitioners shown how the cut-off date adversely affected their net income for 1947 and 1948. Petitioners' objections to the inventory evaluation are without merit. They presented some evidence to show that the market value of the inventory was little more than the value of scrap; however, the sales record subsequent to the inventory date indicates that the inventory was sold as equipment and not as scrap. Further, there is evidence to indicate that Ralph himself thought enough of the inventory to pay $12,500 for his partner's one-fourth interest in the venture. If one-fourth were worth $12,500, then four-fourths would probably be worth $50,000. We believe that the respondent's value of $28,677.18 based on cost is more reasonable then petitioners' suggested scrap value of approximately $2,500. Petitioners' next objection concerns the per cent of the income allocated to them by respondent. The original agreement between the Equipment Company and Donohue *351 provided that the Equipment Company would receive 75 per cent of the profits with the balance paid to Donohue. However, the evidence shows that Donohue received nothing in 1947 and only $500 in 1948 (when gross sales were $39,480.90) and $13,003.74 in 1949. These payments aggregated $13,503.74 which was the amount of Donohue's original interest. Later when it was decided to dissolve the partnership, the Equipment Company purchased Donohue's interest in the business. The Equipment Company, through Ralph, was to pay Donohue $6,000 in cash which was paid, and $6,500 payable out of 25 per cent of the aggregate proceeds from sales of the remaining venture equipment. There was evidence to show that an aggregate of $16,232.23 was paid or charged to Donohue between February 20, 1950, and May 13, 1952, but since Donohue and the Equipment Company were jointly engaged in other business ventures we do not know how much was paid for the completion of the Granite City Deal. When we view all the transactions involving the distribution of funds we can only say that petitioners have failed to prove that they distributed the money according to the original agreement. The fourth objection to the correctness *352 of respondent's allocation involves the transactions whereby 10 items with a total sales price of $4,500 were exchanged for a truck and scraper worth $4,500. Petitioners argue that because equipment worth $4,500 was exchanged for equipment worth $4,500, no gain or loss should be recognized. This may or may not be true depending upon petitioner's basis in their stock in trade and the expenses of the sale. Actually whether there is a gain or loss can not be determined until the cost of goods sold and expenses are deducted from gross sales. This can be done in the normal accounting procedure when inventories are used or by some other method of allocation as used by respondent in his determination. We see no reason for sustaining petitioners' objections as to the inclusion of this $4,500 in gross sales; however, respondent must also properly include in the cut-off inventory the value ($4,500) of the truck and scraper. If the inventory as determined by respondent in the amount of $28,677.18 does not contain the truck and scraper, the addition must be made under a Rule 50 computation. With regard to the Al Fischel Deal, four pieces of equipment were purchased in February 1948 for $19,000. *353 Three items were sold in the same year for $19,050. The fourth was sold in 1949 for $6,500. The aggregate profit realized from the venture was $4,292.65. The Equipment Company received $2,017.65 and the other participants the balance. Of the $2,017.65 respondent allocated $1,698.38 to petitioners' 1948 income. Petitioners objected to the disallowance of their accounting method for reporting income from this venture. However, what has been said above with regard to the propriety of reporting income on an annual basis is also applicable to the Al Fischel Deal; hence, respondent must be sustained. Respondent's adjustments to 1947 and 1948 income, with the conceded correction for the $175 paid to Donohue, must be sustained. Issues 4 and 5 - Deductions for the Apartment Findings of Fact. - In 1943 Ralph purchased for approximately $10,250 a four-unit apartment building in Kansas City, Missouri. It was a frame building with stucco and brick trim. At the time of his purchase the ten year old building had an expected useful life of 20 years. Ralph continued to own the building during 1945, 1946, 1947 and 1948. The rent on each apartment was frozen at $45 per month. For a short period *354 after Ralph purchased the building his attorney managed it and collected the rent. This arrangement proved unsatisfactory and Ralph asked some of the tenants if they would be interested in managing the building. Some were willing to do the work, but differences concerning the remuneration could not be settled. Ralph then asked Mr. and Mrs. Green, his wife's parents, to manage the building. An agreement was worked out whereby in exchange for free rent they would manage the apartments, collect the rent, look after the walks, clean the halls, and take care of the utilities. Rent payments from the apartment were deposited in a Jean Spitcaufsky Real Estate Account in a Kansas City Bank. Proof of the actual operating expenses was not presented at the hearing but Ralph and respondent did agree on the aggregate amount. The aggregate included such items as taxes, fuel, lights, gas and water, janitor service, trash hauling, furniture expenses, window repairs, awning expense and insurance. Respondent's adjustments to rental income in 1945, 1946, 1947 and 1948 were a result of (1) a reduction in the claimed depreciation expense, and (2) a disallowance of one-fourth of the aggregate of the *355 claimed operating expenses. Opinion. - These issues resulting from respondent's adjustments involve two factual questions: one, the propriety of a claimed depreciation deduction, and two, whether one-fourth of the total expenses for a four-unit apartment building is personal expense and therefore not deductible in computing taxable income from this building. In computing the depreciation deduction Ralph estimated the useful life of the building to be 20 years while respondent determined it to be 33 1/3 years. Ralph based his estimate on personal experience in the building and construction business. The revenue agent who investigated Ralph's rental income had no such experience, nor was it brought out that the agent had any special knowledge of buildings or the condition of buildings as it might affect their useful life. From the record it appears that the respondent adopted the agent's findings without any additional investigation so that his estimate in fact would be no better than the agent's estimate. Our findings of fact are determinative of the depreciation question, and will be considered under a Rule 50 computation. For the second question, respondent disallowed, as *356 personal expenses, one-fourth of the aggregate expenses for the four-unit apartment building. Respondent maintains that the apartment for the Greens was given to them gratuitously, and not in exchange for services. Ralph contends that the arrangement, whereby the Greens moved into one of the apartments, was entered into for a business purpose. He concludes that the expenses were incurred in the management of property for profit. Ralph testified that he gave the Greens the apartment rent free "in return for their services and managing the apartment". Respondent did not attempt to refute this testimony at the hearing; but on brief attempts to discredit his testimony. Apparently no books were kept by Ralph for the apartment. However, when the revenue agent investigated the apartment income Ralph submitted a list of expenditures allegedly relating to the operation of the building. The agent was able to check some of the claimed expenditures but not all of them; nevertheless, none of the claimed expenditures was disallowed. The deficiency was determined as the result of the disallowance of one-fourth of the aggregate under the theory that the expenditures were made but only three-fourths *357 were attributed to business purposes. Respondent chose to accept Ralph's statement of his aggregate expenditures. But now elects not to accept Ralph's statement that all the expenses were incurred for a business purpose. Neither party offered affirmative evidence as to the actual work performed by the Greens; for reasons unknown to us, the Greens were not called upon to testify. Certainly their testimony concerning their own work, or lack of it, would have aided us in arriving at a correct decision. From the record we can only determine that Ralph met his burden of proof and on this issue he must be sustained. Issue 6 - Unreported Income Findings of Fact. - For the years 1945, 1946, 1947 and 1948 respondent determined that Ralph had certain unreported income. Respondent made adjustments to Ralph's net income in these years by adding the amounts of certain checks which were either endorsed by Ralph or were made payable to him. Occasionally Ralph was an accommodation endorser for friends and business associates. His endorsement on these checks was only provided for the purpose of helping his friends and associates cash checks. For the year 1945 respondent determined that Ralph *358 had unreported income in the amount of $1,266.50. This sum resulted from three checks in the amounts of $1,052, $102 and $112.50, upon which Ralph was the last endorser. Respondent concedes on brief that the $1,052 was not income to Ralph. This check involved a mere transfer of funds. For the year 1946 respondent determined that Ralph had unreported income in the amount of $4,350; this aggregate included the following amounts: $1,300, $1,000, $1,250 and $800. The sum of $1,300 was part of the cost of certain real estate purchased by Ralph and his wife. The $1,000 was determined to have come from a cashier's check payable to Ralph. The $1,250 represented a deposit to an account at the Commercial National Bank in August 1946. The balance resulted from an $800 check drawn by Frances Rose. Ralph and his wife in 1946 purchased a lot for $9,500. This lot was paid for with three checks in the amounts of $8,000, $1,000 and $500. There was no question as to the source of the $1,000 and $500 checks, nor was there a question as to the source of $6,700 of the $8,000 check. There only remained a question as to the balance of $1,300. In the fall of 1946 Ralph purchased five dump trucks for *359 $1,000. Before paying for the trucks Ralph resold them for $2,500. Ralph received a $1,000 cashier's check from his purchaser in part payment for the trucks; later the purchaser paid Ralph $1,500 in complete payment for the trucks. Upon receipt of the $1,000 check Ralph cashed it and paid his vendor. On the books of the Equipment Company an entry was made showing the receipt of the original $1,000 but later this entry was deleted. Some time prior to August 1946 Ralph received a check in the amount of $1,250 from an oil broker. This check represented a repayment of Ralph's original investment of $1,000 and a gain of $250. When respondent-adjusted Ralph's 1946 income, he used the entire $1,250 as additional income. For the year 1947 respondent determined that Ralph had unreported income of $570. This adjustment resulted from two checks in the amounts of $115 and $455, upon which Ralph was the last endorser. The check for $115 was received by Ralph as compensation for personal injury. The respondent concedes on brief that this sum was not income to Ralph. The $455 check was drawn by a man who owed Ralph $75. Both respondent and petitioner agree that the drawer of this check owed Ralph *360 $75 and there is no dispute about the distribution of the $455. Seventy-five dollars was paid to Ralph and on brief respondent concedes that $380 was returned to the drawer; therefore this was not income to Ralph. There is a dispute as to why Ralph was paid the $75. For the year 1948 respondent determined that Ralph had unreported income of $450. He determined that this amount resulted from two checks of $225 each on which Ralph was the last endorser. These two checks for $225 each, together with the three other checks mentioned above in the amounts of $800, $102 and $112.50, were not income to Ralph. Opinion. - We shall first consider the checks for 1945. Respondent's concession on brief as to the $1,052 obviates the necessity for any discussion on this check. As to the other checks in the amounts of $102 and $112.50, Ralph testified that he did not know the drawer of either check, nor did he have any transactions with them. He further testified that he did not receive the money for the checks. Respondent did not present any record of these checks other than the deficiency notice and the agent's report. Respondent contends with regard to these checks that since the only proof *361 offered was Ralph's testimony the evidence is insufficient to overcome the presumption of the correctness of respondent's determination. We do not agree. See Arthur N. Blum, 11 T.C. 101, 110; affd., 183 Fed. (2d) 281. We see no reason for not accepting Ralph's testimony as establishing a prima facie case that respondent erred in his determination with regard to these checks Respondent did not cross examine Ralph with regard to them, nor did the respondent offer any independent proof for his determination. Even when respondent's witnesses, one special agent and two revenue agents, testified, respondent's counsel failed to elicit any testimony tending to prove that these checks constituted additional income. Therefore, with regard to these two checks, petitioners must be sustained. Now for the adjustments in 1946, since there was no explanation as to the source of the $1,300 other than a statement on brief that the sum was from "petitioner's own or borrowed funds", the respondent must be sustained as to this amount. There is ample testimony that Ralph included the receipt of the $1,500 on his books and on his 1946 return, but we have no evidence that the *362 $1,000 was included. We have no evidence that when Ralph deleted the entry for the $1,000 from his books he also deleted a like sum from the purchase account. If petitioners intended for their books to show only the net income from the transaction, an adjustment to the purchase account would be necessary if a reduction were made to the sales account. Petitioners have not shown that respondent erred; therefore, respondent must be sustained. The record indicates that of the check for $1,250 only $250 of the aggregate sum was gain; the other $1,000 was a return of capital and not gain. The holding period for this investment was not shown; therefore, the gain is held to be a short-term gain. See Rose J. Linde, 17 T.C. 584, 596. The record, our findings, and our holding with regard to the $800 check in 1946 do not differ, except in amount, from the checks for $102 and $112.50 in 1945, which were discussed above. On brief, for the 1947 adjustment Ralph contends that the $75 was returned to him as a repayment for a loan. The record does not sustain such a finding. In the absence of proof that it was a repayment of a loan respondent must be sustained. Finally, we see no *363 difference between the $450 adjustment for 1948 and the $102 and $112.50 adjustments for 1945. For the reasons stated above, Ralph must be sustained as to the $450 adjustment to his 1948 income. Decisions will be entered under Rule 50. Footnotes
*. 1949 is not before us.↩
1. SEC. 3797. DEFINITIONS. (a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof - * * *
(2) PARTNERSHIP AND PARTNER. - The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization. * * * SEC. 187. PARTNERSHIP RETURNS. Every partnership shall make a return for each taxable year, stating specifically the items of its gross income and the deductions allowed by this chapter and such other information for the purpose of carrying out the provisions of this chapter as the Commissioner with the approval of the Secretary may by regulations prescribe, and shall include in the return the names and addresses of the individuals who would be entitled to share in the net income if distributed and the amount of the distributive share of each individual. The return shall be sworn to by any one of the partners. SEC. 182. TAX OF PARTNERS. In computing the net income of each partner, he shall include, whether or not distribution is made to him - * * *
(c) His distributive share of the ordinary net income or the ordinary net loss of the partnership, computed as provided in section 183(b).↩